MUNFORD, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 13720-83.　　　Filed August 18, 1986.

*Herschel M. Bloom*, *Ralph B. Levy*, and *Peter J. Genz*, for the petitioners.

*Lourdes M. Desantis* and *Donald W. Williamson, Jr.*, for the respondent.

FAY, *Judge*: Respondent determined deficiencies in petitioner's Federal income tax as follows:

| Taxable year ended— | Deficiency |
|---|---|
| Jan. 3, 1974 | $50,343 |
| Jan. 2, 1975 | 48,831 |
| Jan. 1, 1976 | 445,755 |

After concessions, the issues are (1) whether petitioner is entitled to an investment tax credit under section 38[1] with respect to an addition to a refrigerated storage facility to an extent greater than allowed by respondent, and (2) whether petitioner is entitled to depreciate the addition to the refrigerated storage facility using the 200-percent declining balance method of depreciation under section 167(b)(2) and an 8-year useful life.[2]

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

[2] As tried and briefed by the parties, this case also presented the issue of whether petitioner had properly adjusted its basis in the stock of a wholly owned subsidiary, Farmbest Foods, Inc. (Farmbest), to account for gain or loss upon disposition of such stock during its taxable year ended Dec. 28, 1978. Resolution of that issue was dependent upon the interplay of sec. 312(k) and the provisions of respondent's consolidated return regulations, particularly sec. 1.1502-32, Income Tax Regs. The parties agreed that if petitioner's basis adjustments were correct, petitioner realized a long-term capital loss (net of selling expenses) of $850,582 upon the sale of Farmbest stock, and that, if respondent's basis adjustments were correct, petitioner realized a long-term capital gain of $701,095 upon the sale of such stock. However, subsequent to our decision in *Woods Investment Co. v. Commissioner*, 85 T.C. 274 (1985), in which basis adjustments similar to those used by petitioner were sustained, respondent filed a notice with

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner, Munford, Inc., had its principal place of business in Atlanta, Georgia, at the time it filed the petition herein.

Petitioner is the common parent of an affiliated group of corporations which filed consolidated Federal income tax returns for all the taxable years in issue. For the taxable year 1971, petitioner filed its consolidated Federal income tax return on a calendar year basis. For taxable years beginning after December 31, 1971, petitioner filed its consolidated returns on a 52- to 53-week basis, with each taxable year ending on the Thursday nearest December 31. Petitioner used the accrual method of accounting.

Petitioner was founded in 1909 as an ice and coal supply company. Petitioner opened its first convenience food store in 1949 and, during the 1950's, expanded its business activities to include the ownership and operation of commercial refrigerated facilities. Petitioner acquired a chain of building material stores in 1962, and opened retail gift stores in 1965. Beginning in 1975, petitioner expanded its operations to include dairy processing divisions. During the years in issue, petitioner was thus engaged in a variety of businesses.

### Issue 1. Investment Tax Credit

During its taxable year ended December 30, 1976,[3] petitioner owned and operated 12 refrigerated facilities in the southeastern United States, including a facility located at Xavier Drive, S.W., Atlanta, Georgia (herein the Gateway Facility). During that year, petitioner completed the

---

the Court indicating that he no longer wished to pursue his legal arguments concerning the adjustments to the basis of the Farmbest stock. He therein conceded that petitioner did not realize a long-term capital gain of $701,095 upon the sale of the Farmbest stock during its taxable year ended Dec. 28, 1978.

[3]Although the notice of deficiency does not purport to determine petitioner's Federal income tax liability for its taxable year ended Dec. 30, 1976, such period is relevant herein in that petitioner claimed investment tax carryback therefrom to 2 of the years here in issue. See note 5 and accompanying text *infra*. Moreover, although the stipulation of facts refers to the relevant taxable year as ending on Dec. *31*, 1976, other references in the record are to petitioner's taxable year ending Dec. *30*, 1976. This latter date appears to be correct, since it was a Thursday and petitioner used a 52- to 53-week year ending on the Thursday closest to Dec. 31.

construction of, and began operating, an addition to the Gateway Facility (herein the Addition) which is the subject of this proceeding. The Addition, the operation and construction of which are described in greater detail herein, consists of three areas: (1) A refrigerated portion comprising approximately 34,650 square feet, (2) a structure used as a loading dock and staging area for loading and unloading trucks, comprising approximately 3,900 square feet, and (3) a structure used as a covered rail dock for unloading goods shipped by rail, comprising approximately 1,030 square feet.

a. *Operation of Addition*

Since the time it was put into operation, the Addition has been used exclusively by petitioner to receive and store on behalf of frozen food processors, final-processed, packaged frozen foods at low temperature, pending delivery to the customers of such processors in the southeastern United States. These customers consist primarily of grocery store chains and other food service organizations, such as schools and cafeterias. Approximately 150 food processors use the Gateway Facility on a regular basis. All products that arrive at the Addition are packaged and labeled by the processor prior to delivery to the Addition. The Addition is not used either to process or to manufacture frozen foods.

Approximately 25 to 30 percent of the frozen food products stored at the Addition arrive aboard refrigerated railroad boxcars that run along a spur line adjacent to the rear of the Addition. The boxcars are not owned or operated by petitioner. All other frozen food products stored at the Addition arrive by refrigerated tractor trailer trucks operated by independent common carriers.

The Gateway Facility has approximately 50 employees who handle the movement of frozen foods in and out of the entire facility. The movement of food products in and out of the Addition is generally handled by a work crew consisting of a foreman and two or three helpers drawn from the 50 employees.

Upon arriving at the Addition, boxes of frozen foods are removed from the boxcars and from the tractor trailers by petitioner's employees using forklifts, and then counted and placed on pallets. The food products are then stored in the

refrigerated area of the Addition on large pallet racks in the same cartons or boxes in which they were shipped by the food processors. Legal title to the frozen foods stored in the Addition is not taken by petitioner, but rather, is retained by the frozen food processors. When frozen food cartons or boxes are unloaded and placed in the refrigerated portion of the Gateway Addition, the frozen food processor receives a credit to the inventory which it has stored in the Addition.

After storage, frozen foods are generally shipped out of the Addition via tractor trailer trucks. When a truck is fully loaded and ready to leave the Addition, its driver signs a bill of lading and assumes the risk of transporting the frozen foods. As part of its service to customers, petitioner arranges for frozen foods to be shipped from the Addition to a 15-State region encompassing all of the southeastern United States. Upon receiving a release from a frozen food processor authorizing a shipment, the traffic department at the Gateway Facility arranges for a commercial trucker to make the delivery. When the refrigerated truck arrives at the Gateway Facility, all merchandise scheduled for delivery to that particular destination or region, regardless of ownership, is culled, grouped, and loaded by forklifts onto the waiting truck. This process is called "consolidation" and is designed to give petitioner's customers the benefit of the cheaper rates charged by truckers for transporting full loads. Petitioner charges its customers a special consolidation fee for this service. Petitioner pays the freight bill on the shipment of goods from the Addition on behalf of the frozen food processors and then bills each processor for its proportionate share of the total freight bill.

When the frozen food cartons or boxes are shipped out of the Addition, the frozen food processor receives a debit to its inventory. To ensure that the oldest merchandise in storage is shipped out first, each pallet of frozen foods is tagged with an inventory control number that allows petitioner's employees, with the assistance of a computerized, first-in, first-out (FIFO) inventory control system, to locate the oldest stored merchandise for each customer. Petitioner charges each processor which stores frozen foods within the Addition a one-time handling and storage fee based on the weight of the stored products. This fee is in

addition to any applicable consolidation fee and freight bill reimbursement.

The refrigerated area of the Addition is maintained at a temperature ranging from minus five degrees Fahrenheit (-5 degrees F) to zero degrees Fahrenheit (0 degrees F). Due to the low temperature, petitioner's employees work within the refrigerated area of the Addition only to load and unload frozen foods, take inventory, and perform occasional repairs or maintenance. Because of the cold temperature, they generally do not stay within the area more than 12 minutes at a time. To protect against the cold, the employees wear cold weather gear, including coveralls, parkas, hats, and gloves while working in this area. Such gear is not worn by petitioner's employees when loading or unloading goods from the refrigerated boxcars or trucks.

Petitioner's employees enter and exit the refrigerated area of the Addition almost exclusively on electrically powered forklifts, which are used to move the frozen food products in and out of the Addition. They also generally use forklifts to move about the loading dock areas.

b. *Construction of Addition*

Petitioner hired John W. Freeman (Freeman) and John E. Anderson (Anderson) to design the Addition. Freeman is a structural engineer who has designed approximately 20 commercial refrigerated facilities and about the same number of dry warehouses for various clients, including petitioner. Anderson is a refrigeration engineer who has designed systems for at least 10 commercial refrigeration facilities. In designing the Addition, Anderson and Freeman coordinated their efforts to insure the compatibility of the structure and the refrigeration system.

The foundation of the Addition consists of concrete footings which support the structure. In order not to be affected by the cold temperatures within the Addition, the footings are placed at a depth of 2 to 3 feet below the floor. Above the foundation, there is a system of under-floor ventilation pipes intended to prevent the earth below the structure from freezing; without this system, frost buildup in the fill beneath the Addition would eventually cause the concrete slab floor of the structure to heave and crack. Air

is drawn through the ventilation system by fans, and the system can be enhanced if necessary, by forcing heated air through the pipes.

The under-floor ventilation system is covered by a bed of sand. Above the sand bed is a "vapor barrier" consisting of polyethylene laid out in large sheets. The vapor barrier, which extends from beneath the floor and continues vertically inside the walls of the Addition, is intended to prevent moisture from penetrating the Addition. The portion of the vapor barrier located beneath the floor is sealed at the joints to prevent any moisture penetration from the earth, and is covered by 6 inches of low temperature insulation. This insulation was placed directly upon the vapor barrier in two segments, or "boards," which were staggered at the joints to reduce channels for temperature migration.

The floor of the Addition consists of a concrete slab which was poured over the low temperature insulation. Since contraction in the floor could occur as a result of the low temperatures within the Addition, a number of contraction joints were provided in the slab to minimize the possibility of cracking. Moreover, since the slab rests upon low temperature insulation, which is rather compressible relative to normal soil, the slab contains long steel rod dowels inserted in sleeves across the contraction joints in order to maintain proper alignment of the slab surface. Nothing protrudes from the floor surface but concrete curbs which line the base of the walls and act as bumper guards for the forklifts.

The outer walls of the Addition consist of "tilt-up" concrete panels which were cast on site using conventional building materials and tilted into place. At the corners abutting the floor and walls of the structure, the continuity of the polyethylene vapor barrier is maintained. The sheets comprising the vapor barrier extend up along the inside of the walls of the structure and are hung from a point near the top of the walls. The joints of the vapor barrier are sealed.

The vapor barrier is covered within the walls of the Addition by 8 inches of low temperature insulation. This insulation was erected against the walls in two layers, with staggered joints to minimize temperature migration. To

protect and provide continuity for the vapor barrier and the insulation, a high strength corner flashing (reinforcement material) is located at the joints where the wall insulation and the floor insulation overlap. Similarly, continuity of the vapor barrier and insulation is maintained by means of overlapped joints at the abutting wall corners of the structure. The insulation layers are covered on the interior of the structure by 5/8-inch type "X" fire-resistant gypsum board. The gypsum board is intended to protect the insulation from damage. In addition, since it is highly flammable, the insulation is required by fire code guidelines to be enclosed in an air tight manner, and the gypsum board also performs this function. The insulation and the vapor barrier are not visible in the finished Addition, and cannot be removed without tearing out the existing wall and floor structures.

The roof of the Addition is constructed of steel decking. In order to maintain continuity of the vapor barrier and insulation at the juncture of the roof and the walls, the roof is not supported by the walls of the structure, but rather, rests upon columns of structural steel located within the Addition near the walls. The gap between the roof and walls is designed to allow the vapor barrier and insulation to "turn the corner" from the walls and continue along the roof without interruption.

The roof has 10 inches of low temperature insulation, comprised of two layers. A continuous wood blocking is bolted to the roof deck near the perimeter of the deck (near the upper portion of the walls) and the first layer of roofing insulation is located between the blocking and the wall insulation under compression, forming a tight seal. In addition to the low temperature insulation, the roof also contains two layers of noncombustible insulation board. The lower layer serves to separate the steel deck from the flammable low temperature insulation, and the upper layer was installed principally to allow hot bitumen (asphalt) to be mopped onto the built-up roof without damaging the low temperature insulation. Each layer of insulation board is attached to the low temperature insulation by means of adhesives. The joints of both the noncombustible and low temperature insulation are staggered to reduce channels for

temperature migration. The built-up roofing of the Addition serves as a continuation of the vapor barrier and insulation as found within the walls and beneath the floor of the structure.

The Addition's rail loading platform, approximately 16 feet wide, is located at the rear of the Addition. The platform is used for loading and unloading railroad cars which deliver frozen foods to the Addition. It has a roof, but no outer or side walls, and covers an area of approximately 1,030 square feet.

The Addition's truck loading platform is a raised concrete platform which runs along the front of the Addition. This platform, which is enclosed, but not refrigerated, is 25 feet wide, and covers an area of approximately 3,900 square feet. It has seven exterior roll-up doors, each approximately 8 feet wide, that permit access to the refrigerated trucks. The truck loading platform was constructed at a height sufficient to ease the loading and unloading of products at the dock. It is used as a staging area for loading and unloading refrigerated trucks. It contains sufficient space for consolidating or storing the products, so that frozen foods can be quickly loaded when a common carrier arrives. Petitioner's employees assigned to the Addition spend a substantial part of their workday within the loading platform area. Attached to the platform are seven dock levelers designed to provide a ramp from the back of open tractor trailers onto the loading platform. At the foot of the truck loading platform is a truck loading pad constructed of reinforced concrete which measures 110 feet by 50 feet. This pad is constructed so that the tractor trailer wheels will not sink into the ground when the trucks are being loaded or unloaded.

The refrigerated area of the Addition covers 34,650 square feet. It contains multi-level storage racks with openings sized to accommodate products stacked on pallets and lifted into place by forklifts. The aisles of the refrigerated area are wide enough to accommodate the movement of the forklifts operated by petitioner's employees. Lighting in this area is provided by special low temperature mercury vapor lamps, since normal commercial fluorescent lighting will not work in the low temperatures maintained therein.

The refrigerated area of the Addition is cooled by a system which is controlled from a central "engine room" which services the entire Gateway Facility. The engine room, which was not constructed as a part of the Addition, is designed as a fully automated system and does not require regular supervision. It is, however, monitored on a daily basis by one of petitioner's employees. The engine room has a small work area consisting of a desk and chair, but the noise of the equipment makes it uncomfortable for a person to remain in the engine room for more than a brief period.

Located in the engine room are eight heavy compressors which operate to lower the temperature of ammonia and then pump it through insulated pipes that run along the roof of the Gateway Facility. These pipes are connected to large evaporator units located within each refrigerated area of the Gateway Facility. Three such units are suspended from the ceiling of the Addition. These units, each of which has a cooling capacity of 25 tons British thermal units, force large volumes of air past the frigid ammonia and then direct the cold air into the refrigerated area of the Addition. The evaporator units were moved into the Addition from another portion of the Gateway Facility at the time the Addition was constructed.

When the Addition was constructed, the existing compressors in the engine room had sufficient excess capacity to cool the Addition; thus, no new compressors were added. However, the engine room had to be modified and new ammonia pipelines added in order to accomplish this task. The compressors in the engine room can be removed, but are generally repaired and serviced in place. In the past, one of the compressors was moved from the engine room for repair.

The three evaporator units suspended from the ceiling of the refrigerated area of the Addition, as well as the compressors in the engine room, can be moved without structural damage to the Addition. However, the vent pipes beneath the floor, the low temperature insulation, and the polyethylene vapor barrier cannot be moved without damaging the structure of the Addition.

The Addition has two special compartments, or vestibules, located between the refrigerated area and the truck loading platform. These vestibules function as "air locks" and help prevent the warmer outside air and moisture from entering the refrigerated area. The vestibules are constructed so as to maintain continuity of the vapor barrier and insulation. Each time the outer door of a vestibule opens, the interior of the vestibule receives an influx of warm, moist air. To prevent freezing of this moisture, heat lamps are used in the vestibules to maintain above-freezing temperatures for the inner floor, wall, and ceiling surfaces, as well as the door hinges. At night, the exterior of each vestibule is sealed off by heavy, metal-clad doors containing low temperature insulation. The perimeter of each door contains gaskets which form a seal with the wall insulation. These gaskets also contain heat cables to prevent freezing of condensation which could otherwise cause the doors to jam.

The design and construction of the Addition involve numerous features which would not be found in a conventional or dry warehouse. For example, the concrete footings forming the foundation of the Addition were placed at a depth of 2 to 3 feet below the floor to protect them from cold temperatures within the Addition, whereas footings used in the construction of a dry warehouse would generally be placed at a depth of approximately 8 inches. The underground ventilation system, the doweled construction joints in the floor slab, the vapor barrier, and the extensive low temperature insulation used in the Addition would not typically be found in a dry warehouse, nor would the vestibules found in the Addition serve any purpose in a dry warehouse.[4]

On its consolidated Federal income tax returns for the taxable years ended January 3, 1974, and January 1, 1976, petitioner claimed investment tax credit carrybacks from its taxable year ended December 30, 1976, with respect to $581,437 of costs relating to the Addition. In his notice of deficiency, respondent disallowed the claimed investment tax credit, except with respect to certain refrigeration

---

[4]Although vapor barriers are occasionally used in the construction of dry warehouses, a thinner gauge polyethylene is used in those structures and the seams of the polyethylene sheets comprising the barrier are not sealed.

system components of the Addition, including refrigeration pipes, pipe insulation, valves, and motors, costing in the aggregate $103,470.12.[5] Thus, the costs of the Addition that are at issue in this case total $477,967 (i.e., $581,437 claimed by petitioner, less $103,470 allowed by respondent).[6]

## Issue 2. Depreciation

Petitioner has consistently followed the practice of deducting one-half of the first year's depreciation allowable with respect to its depreciable property in the taxable year in which the property is placed in service. The Addition was completed and began operation during petitioner's taxable year ended December 30, 1976. However, petitioner failed to claim any allowance for depreciation with respect to the Addition for such taxable year. On its consolidated Federal income tax return for the taxable year ended December 29, 1977, petitioner claimed an allowance for depreciation with respect to the Addition, based upon an estimated useful life of 40 years. After the pleadings were filed in the instant case, petitioner filed amended returns claiming one-half of the allowable first year's depreciation with respect to the Addition for the taxable year ended December 30, 1976, and a full year's depreciation for the taxable year ended December 29, 1977. The allowance for depreciation claimed on these amended returns was computed using the 200-percent declining balance method provided for in section 167(b)(2), and an estimated useful life of 8 years.

### OPINION

## Issue 1. Investment Tax Credit

The first issue is whether petitioner is entitled to an investment tax credit under section 38 with respect to the

---

[5]Petitioner also claimed, and respondent disallowed, investment tax credit carrybacks from its taxable year ended Dec. 30, 1976, with respect to $27,710 of costs relating to vestibules constructed in refrigerated facilities other than the Addition. In an amendment to the petition filed herein, petitioner indicated that it would not contest respondent's determination with respect to such costs.

[6]Of this amount, $404,585 represents the segregable cost of the structure that comprises the refrigerated area of the Addition, together with the electrical components allocable to that portion of the Addition. This $404,585 figure excludes the cost of the truck and rail loading platforms, the dock leveling equipment, truck loading pad, electrical components relating to the loading docks, and other costs not directly related to the structure which encloses the refrigerated area of the Addition.

Addition to an extent greater than allowed by respondent. Section 38 allows a credit against tax as determined under sections 46 and 48. Under section 46, there is allowed as a credit a specified percentage of the taxpayer's investment in certain qualifying property, known as section 38 property. See secs. 46(a) and 46(c). The dispute of the parties in the instant case concerns whether the Addition constitutes or consists of section 38 property.

The term "section 38 property" is defined in section 48(a)(1), which provides, in relevant part, as follows:

> (1) IN GENERAL.— * * * the term "section 38 property" means—
>   (A) tangible personal property, or
>   (B) other tangible property (not including a building and its structural components) but only if such property—
>     (i) is used as an integral part of manufacturing, production, or extraction, or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or
>     (ii) constitutes a research facility used in connection with any of the activities referred to in clause (i), or
>     (iii) constitutes a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities (including commodities in a liquid or gaseous state), * * *
> Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more.

As the statutory language indicates, sections 48(a)(1)(A) and 48(a)(1)(B) create two distinct categories of section 38 property. First, tangible personal property will be considered section 38 property under section 48(a)(1)(A). Second, other tangible property, other than a building and its structural components, may qualify as section 38 property under section 48(a)(1)(B), but only if it is used as an integral part of, or (in the case of research facilities and bulk storage facilities described respectively in subparagraphs (ii) and (iii) thereof), used in connection with, one of the qualifying activities described in section 48(a)(1)(B)(i). See *Giannini Packing Corp. v. Commissioner*, 83 T.C. 526, 531-532 (1984); *Central Citrus Co. v. Commissioner*, 58 T.C. 365, 370 (1972); *Schuyler Grain Co. v. Commissioner*, 50 T.C. 265, 269 (1968), affd. 411 F.2d 649 (7th Cir. 1969). Petitioner has conceded that the Addition is used neither as an integral

part of, nor in connection with, a qualifying activity,[7] and, thus, does not argue that it constitutes other tangible property described in section 48(a)(1)(B). Rather, petitioner asks us to hold that the Addition is tangible personal property qualifying as section 38 property under section 48(a)(1)(A). Thus, the focus of our inquiry is whether the Addition constitutes or consists of tangible personal property within the meaning of section 48(a)(1)(A).[8]

The term "tangible personal property" is defined in section 1.48-1(c), Income Tax Regs. This regulation, which was promulgated under the broad grant of authority contained in section 38(b), provides as follows:

(c) *Definition of tangible personal property.*—If property is tangible personal property it may qualify as section 38 property irrespective of whether it is used as an integral part of an activity (or constitutes a research or storage facility used in connection with such activity) specified in paragraph (a) of this section. Local law shall not be controlling for purposes of determining whether property is or is not "tangible" or "personal." Thus, the fact that under local law property is held to be personal property or tangible property shall not be controlling. Conversely, property may be personal property for purposes of the investment credit even though under local law the property is considered to be a fixture and therefore real property. For purposes of this section, *the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures).* Thus, buildings, swimming

---

[7]As stated in our findings of fact, the Addition is not used either to process or to manufacture frozen foods, and the products stored therein are final-processed, packaged frozen foods.

[8]By virtue of an amendment to the petition filed prior to trial, petitioner alleged that the Addition is tangible personal property under sec. 48(a)(1)(A), and, alternatively, that it is used as an integral part of the manufacturing or production activities of the frozen food processors who store goods therein, and thus qualifies as other tangible property under sec. 48(a)(1)(B)(i). Such amendment withdrew petitioner's allegations, previously raised in the petition, (a) that the Addition is used by food processors to store fungible frozen foods in bulk, and thus constitutes a storage facility described in sec. 48(a)(1)(B)(iii), and (b) that certain components of the Addition, such as vestibule doors, dock levelers and doors, electrical components, and low temperature insulation qualify as tangible personal property under sec. 48(a)(1)(A). Notwithstanding its alternative allegation in the amendment to the petition, petitioner has abandoned its contention that the Addition is other tangible property used in a qualifying activity described in sec. 48(a)(1)(B)(i). In his opening statement, counsel for petitioner distinguished the instant case from certain prior cases of this Court concerning other refrigerated facilities on the ground that such cases involved "either the processing exception for other tangible property or the storage exception for other tangible property [under sec. 48(a)(l)(B)], neither of which we can see as available to us in this case." Similarly, petitioner has not asserted on brief that the Addition is "other tangible property" which qualifies as sec. 38 property under sec. 48(a)(1)(B). Accordingly, petitioner's sole contention is that the Addition qualifies as tangible personal property under sec. 48(a)(1)(A).

pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property. Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building constitutes tangible personal property for purposes of the credit allowed by section 38. *Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property.* [Emphasis supplied.]

Respondent points out that under section 1.48-1(c), Income Tax Regs., the term "tangible personal property" does not include land and improvements thereto, such as buildings or other inherently permanent structures, or structural components of such buildings or structures. In respondent's view, the Addition constitutes a building and is thus excluded from the definition of tangible personal property by the express terms of section 1.48-1(c), Income Tax Regs. Petitioner asserts, however, that the Addition is not a building under applicable judicial interpretations of such term. Further, petitioner contends that the Addition is in essence a giant refrigerator or freezer and is "property which is in the nature of machinery" described in the penultimate sentence of section 1.48-1(c), Income Tax Regs. Petitioner argues that the Addition therefore constitutes tangible personal property. In view of the respective positions of the parties, and in light of the fact that a determination that the Addition is a building would obviate the need for further inquiry herein, we will first address the issue of whether the Addition is a building.

When enacting the investment tax credit provisions as part of the Revenue Act of 1962, Pub. L. 87-834, 76 Stat. 960, Congress excluded buildings and their structural components from eligibility for the credit. In doing so, Congress intended that the term "building" be given its "commonly accepted meaning, that is, a structure or edifice enclosing a space within its walls, and usually covered by a roof." H. Rept. 1447, 87th Cong., 2d Sess. A18, 1962-3 C.B. 405, 516;

S. Rept. 1881, 87th Cong., 2d Sess. 154-155, 1962-3 C.B. 707, 858-859. See, e.g., *Yellow Freight System, Inc. v. United States*, 538 F.2d 790, 795-796 (8th Cir. 1976), revg. and remanding 413 F. Supp. 357 (W.D. Mo. 1975); *Samis v. Commissioner*, 76 T.C. 609, 617 (1981); *Valmont Industries, Inc. v. Commissioner*, 73 T.C. 1059, 1072 (1980); *Satrum v. Commissioner*, 62 T.C. 413, 416 (1974). Nevertheless, the term "building," as used in this context, "has caused much consternation among taxpayers and has produced a correspondingly large amount of litigation." *Scott Paper Co. v. Commissioner*, 74 T.C. 137, 177 (1980) (citations omitted). Certain structures which might in common understanding be considered buildings have, in various cases, been held not to be buildings for purposes of the investment tax credit. *Brown & Williamson Tobacco Corp. v. United States*, 369 F. Supp. 1283 (W.D. Ky. 1973), affd. per curiam 491 F.2d 1258 (6th Cir. 1974) (tobacco sheds); *Brown-Forman Distillers Corp. v. United States*, 205 Ct. Cl. 402, 414-416, 499 F.2d 1263, 1270-1271 (1974) (whiskey maturation facilities); *Thirup v. Commissioner*, 508 F.2d 915 (9th Cir. 1974), revg. 59 T.C. 122 (1972) (greenhouses). See generally *Consolidated Freightways v. Commissioner*, 74 T.C. 768, 794 (1980), affd. in part and revd. in part 708 F.2d 1385 (9th Cir. 1983). It is thus accurate to say that, in the investment tax credit context, the term "building" has become a term of art. See *Scott Paper Co. v. Commissioner*, supra at 177.[9]

---

[9]This fact is not surprising. As this Court noted in *Catron v. Commissioner*, 50 T.C. 306, 310-311 (1968), the statute itself contemplates that certain structures, such as research and storage facilities, may qualify as sec. 38 property under sec. 48(a)(1)(B), even though it is difficult to conceive of many of such facilities "which are not, in some sense, buildings." At least with respect to sec. 48(a)(1)(B), an overly broad application of the term "building" would, in effect, render the remainder of that statutory provision a nullity by categorizing as buildings and denying the credit for many structures to which Congress actually intended the credit to be applicable. Accordingly, courts have been faced with the often delicate task of construing the term "building" so as to give effect to the statute, while yet being mindful of Congress' stated intention that the credit not be extended to "buildings" and their structural components. While the aforementioned considerations might appear more relevant in the context of sec. 48(a)(1)(B) than in that of sec. 48(a)(1)(A), no attempt has been made, either in the decided cases or in respondent's regulations, to define the term "building" differently in the two contexts. See sec. 1.48-1(e)(l), Income Tax Regs. Indeed, to do so would, in our view, inject further complexity into this already difficult area of the tax law. We do note, however, that under sec. 48(a)(1)(A), unlike sec. 48(a)(1)(B), not only buildings, but also other inherently permanent structures, are generally excluded from eligibility for the credit. Compare sec. 1.48-1(c), Income Tax Regs., with sec. 1.48-1(d)(1), Income Tax Regs. See *McKenzie v. Commissioner*, 85 T.C. 875, 896 (1985).

The term "building" is defined in section 1.48-1(e)(1), Income Tax Regs., which provides, in pertinent part, as follows:

Sec. 1.48-1(e). *Definition of building and structural components.*

(1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. * * * Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples.

This regulation has been interpreted to establish a two-part test which considers both "appearance" and "function" in determining whether a particular structure is a "building." Some of the decided cases appear to focus more heavily upon the appearance test which, as its name implies, looks to whether the structure has the appearance of a building in the ordinary sense. See *Yellow Freight System, Inc. v. United States*, 538 F.2d 790, 797-798 (8th Cir. 1976); cf. *A.C. Monk & Co. v. United States*, 686 F.2d 1058 (4th Cir. 1982), affg. in part, revg. and remanding in part an unreported District Court decision. However, most decisions of this Court and other courts have tended to emphasize the functional test. See, e.g., *Thirup v. Commissioner*, 508 F.2d at 919; *Consolidated Freightways, Inc. v. United States*, 223 Ct. Cl. 443, 456-457, 620 F.2d 862, 870 (1980). *Brown-Forman Distillers Corp. v. United States*, 205 Ct. Cl. 402, 416-418, 499 F.2d 1263, 1270-1272 (1974); *Consolidated Freightways v. Commissioner*, 74 T.C. 768, 793-795 (1980), affd. on this issue 708 F.2d 1385 (9th Cir. 1983); *Scott*

*Paper Co. v. Commissioner, supra* at 178; *Valmont Industries, Inc. v. Commissioner, supra* at 1072; *Lesher v. Commissioner,* 73 T.C. 340, 363 (1979), affd. per curiam 638 F.2d 64 (8th Cir. 1981); *Satrum v. Commissioner, supra* at 416; *Central Citrus Co. v. Commissioner,* 58 T.C. 365, 371 (1972); *Catron v. Commissioner,* 50 T.C. 306, 310-311 (1968).

The functional test was first expressed by this Court in *Catron v. Commissioner, supra.* Therein, we noted that section 1.48-1(e)(1), Income Tax Regs., defines "building" as a structure providing space for certain enumerated purposes, such as "the furnishing of shelter or housing, or of working, office, parking display or sales space." While noting that the purposes set forth in section 1.48-1(e)(1), Income Tax Regs., are exemplary and not all-inclusive, we nevertheless construed the regulation to limit the scope of the term "building" to structures used for purposes or functions similar to those enumerated therein. *Catron v. Commissioner, supra* at 311. More recently, this Court has described the functional test as one which inquires whether the purpose of the structure at issue is a purpose ejusdem generis to the purposes described by example in section 1.48-1(e)(1), Income Tax Regs., and whether the structure performs a function similar to those structures therein enumerated as buildings, i.e., apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. *Consolidated Freightways v. Commissioner,* 74 T.C. at 795.

In applying the functional test, a major focus of inquiry is whether the structure provides working space for employees which is more than merely incidental to the primary function of the structure. See, e.g., *Brown-Forman Distillers Corp. v. United States,* 205 Ct. Cl. at 418, 499 F.2d at 1271; *Valmont Industries, Inc. v. Commissioner, supra* at 1072; *Scott Paper Co. v. Commissioner, supra* at 178; *Catron v. Commissioner, supra* at 316. In this regard, it is appropriate to consider both the quantity and quality of the human activity within the structure. See *Consolidated Freightways, Inc. v. United States,* 223 Ct. Cl. at 461, 620 F.2d at 873; *Consolidated Freightways v. Commissioner,* 74 T.C. at 795; *Satrum v. Commissioner, supra* at 417. With the foregoing principles in mind, we now consider whether the Addition constitutes a "building."

It is clear from the testimony of witnesses and photographs in the record that the Addition resembles a building in appearance, and petitioner does not argue to the contrary. Thus, the Addition would be considered a building under the appearance test of section 1.48-1(e)(1), Income Tax Regs. However, the appearance test alone is not determinative; decisions of this Court have emphasized the functional test, and we therefore proceed with our inquiry thereunder.

The Addition consists of three principal areas—the truck loading platform, the rail loading platform, and the refrigerated area. Since these areas are distinct, we think it appropriate to consider each such area separately under the functional test. See, e.g., *Central Citrus Co. v. Commissioner, supra* at 371; and *Catron v. Commissioner, supra* at 313. Cf. *Scott Paper Co. v. Commissioner, supra* at 173-174; *Illinois Cereal Mills, Inc. v. Commissioner,* 789 F.2d 1234 (7th Cir. 1986), affg. a Memorandum Opinion of this Court.[10]

First, we examine the truck loading platform. This area is an enclosed space which comprises approximately 3,900 square feet. In this area, petitioner's employees load and unload refrigerated trucks which transport frozen foods to and from the Addition. Unlike the refrigerated area of the Addition, the truck loading platform is not refrigerated and thus, the employees need not and do not wear protective cold weather gear therein. The platform contains sufficient space for consolidating and storing products so that the frozen foods can be quickly loaded when a common carrier arrives. Petitioner's employees assigned to the Addition

---

[10]In *Catron v. Commissioner,* 50 T.C. 306 (1968), and *Central Citrus Co. v. Commissioner,* 58 T.C. 365 (1972), we looked at discrete areas of a larger structure to determine whether such areas might separately qualify as sec. 38 property. Nevertheless, respondent argues that our consideration of each area of the Addition separately is precluded by *A.C. Monk Co. v. United States,* 686 F.2d 1058 (4th Cir. 1982). In *Monk,* the Fourth Circuit reversed the District Court which, following this Court's decision in *Scott Paper Co. v. Commissioner,* 74 T.C. 137 (1980), had allowed the investment tax credit for a portion of the taxpayer's electrical system based upon the percentage for which it was used to operate specific machinery. The Fourth Circuit indicated that it saw no basis for making such an allocation and allowing the credit for portions of a "single system." *A.C. Monk & Co. v. United States, supra* at 1065. We consider the instant case to be distinguishable from *Monk* in that the Addition involves physically distinct areas, rather than the "single system" at issue in *Monk.* In any event, this Court has adhered to the approach set forth in *Scott Paper,* which was recently approved by the Seventh Circuit in *Illinois Cereal Mills, Inc. v. Commissioner,* 789 F.2d 1234 (7th Cir. 1986), affg. a Memorandum Opinion of this Court.

spend a substantial part of their workday within the loading platform area.

The purpose of the truck loading platform is to facilitate the loading and unloading of frozen food products, and this purpose is accomplished primarily by the efforts of petitioner's employees who work in this area. Human activity is essential, rather than merely incidental, to the function of the platform. Cf. *Consolidated Freightways v. Commissioner*, 74 T.C. at 795-796. In view of the foregoing, we hold that the truck loading platform is a "building" and that the costs relating thereto are thus ineligible for the investment tax credit.

Our conclusion is supported by the case law involving comparable facilities. In *Yellow Freight System, Inc. v. United States, supra,* truck loading docks used by a trucking line to facilitate the movement of freight from inbound to outbound vehicles were found to provide shelter and work space for employees and thus, were held to be "buildings" for purposes of the investment tax credit by the Court of Appeals for the Eighth Circuit. A similar result was reached by the Court of Claims in *Consolidated Freightways, Inc. v. United States*, 223 Ct. Cl. 443, 620 F.2d 862 (1980), and by this Court in *Consolidated Freightways v. Commissioner*, 74 T.C. 768 (1980), affd. on this issue 708 F.2d 1385 (9th Cir. 1983).[11]

The foregoing considerations require a similar conclusion with regard to the Addition's rail loading platform. While the record contains little information concerning the operation of this platform, we discern no purpose served thereby other than to provide a sheltered area in which petitioner's employees can unload refrigerated boxcars which deliver products to the Addition. Since this area serves to provide working space for petitioner's employees in much the same

---

[11]The fact that petitioner's employees use forklifts and pallets to load and unload the trucks on the truck loading platform does not alter our conclusion, since this equipment simply facilitates the task of petitioner's employees—even with this equipment the loading and unloading of products on the truck loading platform is accomplished primarily by the activities of the employees. Cf. *Yellow Freight System, Inc. v. United States*, 538 F.2d 790, 796 (8th Cir. 1976); *Consolidated Freightways, Inc. v. United States*, 223 Ct. Cl. 443, 459-460, 620 F.2d 862, 871-872 (1980).

manner as the truck loading platform, we also conclude that this structure is a building.[12]

Having concluded that the truck and rail loading platforms constitute buildings and that the costs relating thereto are ineligible for the investment tax credit, we now consider the refrigerated area of the Addition.[13] This area comprises approximately 34,650 square feet. It is used to store prepackaged, final processed frozen foods on behalf of the processors of such foods pending delivery to customers. The temperature therein is maintained between minus five degrees Fahrenheit (-5 degrees F) and zero degrees Fahrenheit (0 degrees F). Due to the low temperature, petitioner's employees work within this area only to load and unload frozen foods, take inventory, and perform occasional repairs or maintenance. When doing so, they wear cold weather gear, including coveralls, parkas, hats, and gloves. The employees generally spend no more than 12 minutes at a time in the refrigerated area.

We think that the principal purpose or function of the refrigerated area is not to furnish working space for petitioner's employees, but rather, to provide an area in which frozen foods may be stored at low temperature. In contrast with the truck and rail loading platforms, the refrigerated area of the Addition is maintained at a temperature which limits, rather than promotes, human activity. Due to the cold temperature, the activities of petitioner's employees are limited in both scope and duration. In the case of the Addition's refrigerated area, the structure itself serves the principal function of low temperature storage of products, and the activities of petitioner's employees are merely supportive of and ancillary to this function. Accordingly, we conclude that the refrigerated portion of the Addition is not a building under the functional test.

---

[12]The fact that the rail loading platform was not fully enclosed does not require a contrary conclusion. Cf. *Yellow Freight System, Inc. v. United States*, 223 Ct. Cl. at 456, 620 F.2d at 870 n. 17.

[13]We do not understand petitioner to argue that the truck loading platform and rail loading platform are excluded from the regulations' definition of building as items of "machinery or equipment" under sec. 1.48-1(e)(1)(i), Income Tax Regs. A similar argument was considered, and rejected, in *Yellow Freight System, Inc. v. United States, supra* at 796-797; *Consolidated Freightways, Inc. v. United States*, 223 Ct. Cl. at 463, 670 F.2d at 873-874, and *Consolidated Freightways v. Commissioner*, 74 T.C. at 796-797.

Our conclusion is supported by prior decisions of this Court. In *Catron v. Commissioner, supra,* we held that the refrigerated storage area of a larger quonset-type structure used in the storing, selection, and packaging of apples was eligible for the investment tax credit as a qualifying storage facility under section 48(a)(1)(B)(ii) as then in effect.[14] In so holding, we determined that the refrigerated area was not a building, notwithstanding the entry and exit of employees on forklifts to store and remove goods, which we found to be merely "incidental, subordinate to, and solely in connection with the qualifying apple storage which was the sole use and purpose of the refrigerated facility." *Catron v. Commissioner, supra* at 316.

*Catron* was followed in *Central Citrus Co. v. Commissioner,* 58 T.C. 365 (1972), and *Merchants Refrigerating Co. of Calif. v. Commissioner,* 60 T.C. 856 (1973). In *Central Citrus,* we held that large, atmospherically controlled "sweet rooms" used in processing citrus fruit were not buildings and further, that they constituted qualifying storage facilities under section 48(a)(1)(B)(ii) as then in effect.[15] In *Merchants Refrigerating,* we held that a large freezer room, which had tilt-up concrete walls and concrete floors and which was used for the storage of frozen foods, was not a building, and that it qualified as a storage facility under section 48(a)(1)(B)(ii) as then in effect.[16] In each of these cases, we determined that the facilities in question were not buildings because they did not furnish working space and human activity therein was limited.[17] In *Merchants Refrigerating* and *Catron,* the placing in storage and removal of goods by employees on forklifts were specifically found not to constitute the type of "work" or human activity necessary to categorize the facility as a building. *Catron v. Commissioner, supra* at 316; *Merchants Refrigerating Co. of Calif. v. Commissioner, supra* at 860.[18] In the

---

[14]See note 20 *infra.*

[15]See note 20 *infra.*

[16]See note 20 *infra.*

[17]Cf. *Giannini Packing Corp. v. Commissioner,* 83 T.C. 526, 531 (1984), in which respondent agreed that large rooms designed and used for the cooling of fruit, and not for human shelter or work space, were not "buildings."

[18]See also *Brown & Williamson Tobacco Corp. v. United States,* 369 F. Supp. 1283 (W.D. Ky. 1973), affd. per curiam 491 F.2d 1258 (6th Cir. 1974). In this regard, we note that, in Rev. Rul. 71-489, 1971-2 C.B. 64, respondent ruled that certain refrigerated structures used in the

instant case, as in the cited cases, the refrigerated area of the Addition does not furnish working space, and human activity therein is limited; petitioner's employees enter and exit the refrigerated area of the Addition only to store or remove goods, take inventory, and perform occasional repairs and maintenance. We think that the refrigerated area of the Addition is not fairly distinguishable from those structures held not to be buildings in *Catron, Central Citrus* and, more particularly, *Merchants Refrigerating*.[19] Thus, following our decisions in those cases, we hold that the refrigerated area of the Addition is not a building.[20]

In reaching our conclusion that the refrigerated area of the Addition is not a "building," we have considered, and feel compelled to specifically address, respondent's principal arguments to the contrary.

Respondent argues that the refrigerated portion of the Addition serves as a warehouse used in connection with the distribution of frozen food products and must thus be considered a building. Even if we assume that the Addition functions in some measure as a warehouse,[21] we think that,

---

processing of milk products and ice cream were sec. 38 property, notwithstanding that employees engaged in stacking and unstacking of products therein.

[19]The refrigerated area of the facility in *Merchants Refrigerating* (273 feet by 133 feet, or 36,309 square feet) is comparable in size to the refrigerated area of the Addition (34,650 square feet).

[20]We recognize that *Catron, Central Citrus,* and *Merchants Refrigerating* were decided under the "storage facility" provision of sec. 48(a)(1)(B)(ii), as in effect prior to the amendment of that section by sec. 104(a)(1) of the Revenue Act of 1971, Pub. L. 92-178, 85 Stat. 497. Such amendment narrowed the class of storage facilities eligible for the credit by deleting the general reference to "storage facility" in clause (ii) of sec. 48(a)(1)(B) and adding to sec. 48(a)(1)(B) a new, more specific clause (iii) referring to a "facility used for the bulk storage of fungible commodities." Nevertheless, under the flush language of sec. 48(a)(1)(B) as in effect both before and after such amendment, a structure would be not eligible for the credit if it were a "building." Thus, in reaching our conclusions in *Catron, Central Citrus,* and *Merchants Refrigerating* that the facilities in issue therein constituted sec. 38 property, we were required to determine both that the facilities did not constitute buildings *and* that such facilities did constitute qualifying storage facilities. See, e.g., *Central Citrus Co. v. Commissioner, supra* at 370, wherein we stated: "Before considering petitioner's assertions [that the facility is qualifying storage facility] we must first examine whether the processing chambers are in fact buildings." *Catron, Central Citrus,* and *Merchants Refrigerating* thus remain viable with respect to the "building" issue decided therein. See *Valmont Industries, Inc. v. Commissioner,* 73 T.C. 1059, 1072 (1980); *Lesher v. Commissioner,* 73 T.C. 340, 363 n. 8 (1979), affd. per curiam 638 F.2d 64 (8th Cir. 1981). To this extent, we apply and follow them here.

[21]In Rev. Rul. 74-452, 1974-2 C.B. 11, respondent has indicated that warehouses are generally "conventional buildings used for general storage purposes." Although respondent concluded therein that certain refrigerated structures used for storing frozen foods were warehouses and not sec. 38 property, we do not think that a facility such as the Addition is a "conventional building used for general storage purposes." First, the Addition is not a conventional building, since it contains numerous construction features which would not be found in a conventional or "dry" warehouse. Second, the Addition is not, in our view, used for

under the cited decisions, it is not on this account to be considered a building, notwithstanding the provisions of section 1.48-1(e)(1), Income Tax Regs. Indeed, in *Merchants Refrigerating*, following our decisions in *Catron* and *Central Citrus*, we explicitly rejected respondent's contention that a similar refrigerated structure there in issue was a building, even though it was acknowledged to be "plainly a type of warehouse." *Merchants Refrigerating Co. of Calif. v. Commissioner, supra* at 859. We adhere to the position expressed in our prior decisions and thus, reject respondent's argument.[22]

Respondent also argues that the Addition, of which the refrigerated area constitutes the largest part, must be considered a building because, in his view, the structure is "reasonably adaptable" to other uses. We similarly reject this argument.

As a preliminary matter, it is not clear that the Addition's adaptability to alternate uses is relevant in the instant case in determining whether it is a building. In nearly all the decided cases in this area, any inquiry concerning adaptability has been made only in specific statutory or regulatory contexts not here in issue. Adaptability has been considered, for example, in determining whether a structure is a qualifying storage facility under section 48(a)(1)(B), or a structure which houses other qualifying property as described in section 1.48-1(e)(1)(ii), Income Tax Regs., or a qualifying single purpose agricultural or horticultural structure under section 48(a)(1)(D).[23] However,

---

"general storage purposes," but rather, is both designed and used for the much more specific purpose of storing frozen foods at low temperatures. Thus, notwithstanding respondent's contrary conclusion in Rev. Rul. 74-452, we do not think that a structure like the Addition can fairly be considered a "warehouse" as that term has been used by respondent in the cited ruling.

[22]Notwithstanding our holdings in *Catron, Central Citrus,* and *Merchants Refrigerating,* respondent contends that we must conclude that the refrigerated area of the Addition is a building by reason of our holding in *Circle K Corp. v. Commissioner,* T.C. Memo. 1982-298. Respondent's reliance upon that case is misplaced. Therein, the relevant issue was whether a cold storage room, which was part of an ice manufacturing facility, was sec. 38 property under sec. 48(a)(1)(B)(i). We held that the cold storage room was not sec. 38 property, not on the grounds that it was a building, but rather, because the taxpayer had failed to show the facility was used as an integral part of a qualifying activity as required by sec. 48(a)(1)(B)(i). *Circle K Corp. v. Commissioner, supra,* thus does not require a conclusion contrary to that reached by us herein.

[23]Adaptability has been considered relevant where a structure is claimed to be a qualifying storage facility under sec. 48(a)(1)(B). See, e.g., *Catron v. Commissioner, supra* at 315, citing with approval Rev. Rul. 66-89, 1966-1 C.B. 7, 8-9, which prescribes an inquiry into adaptability

most of the cases which have considered whether a structure is a building have done so by applying the appearance and functional tests, either without considering adaptability, or doing so only where one of the above-cited statutory or regulatory provisions was also at issue.[24]

Furthermore, even if we considered adaptability to be a relevant factor in this context, we would still reject respondent's position, since we think that the Addition is not reasonably adaptable to uses other than low temperature storage. Respondent contends that if the refrigeration system were simply switched off, the Addition could be economically used as a dry warehouse. However, petitioner provided credible testimony, supported by pro forma financial statements, to show that the Gateway Facility, of which the Addition was a part, could be operated profitably as a refrigerated facility, but would operate at a substantial loss if used as a dry warehouse. We find this evidence to be convincing. At trial, respondent introduced an expert wit-

in the storage facility context. See also, e.g., *Tamura v. United States*, 734 F.2d 470 (9th Cir. 1984), revg. and remanding an unreported District Court order; *Brown & Williamson Tobacco Corp. v. United States*, 369 F. Supp. 1283 (W.D. Ky. 1973), affd. per curiam 491 F.2d 1258 (6th Cir. 1974); *Lesher v. Commissioner, supra* at 364; *Central Citrus Co. v. Commissioner, supra* at 371-372; *Olson v. Commissioner*, T.C. Memo. 1970-296. See also Rev. Rul. 84-60, 1984-1 C.B. 13.

Similarly, adaptability has been considered in determining whether a structure is essentially a "skin covering" which houses other qualifying property so as to be within a specific exception to the definition of "building" under sec. 1.48-1(e)(1)(ii), Income Tax Regs. The cited regulation indicates that, in determining whether the exception is applicable, a factor to be considered is "whether the structure could be economically used for other purposes." See, e.g., *Consolidated Freightways, Inc. v. United States*, 223 Ct. Cl. 443, 463, 620 F.2d 862, 873-874 (1980); *Stuppy, Inc. v. United States*, 454 F. Supp. 1378, 1384-1385 (W.D. Mo. 1978); *Endres Floral Co. v. United States*, 450 F. Supp. 16, 24-26 (N.D. Ohio 1977); *Valmont Industries, Inc. v. Commissioner, supra* at 1075-1078; *Satrum v. Commissioner, supra* at 416-417. See also *Illinois Cereal Mills, Inc. v. Commissioner*, T.C. Memo. 1983-469, affd. 789 F.2d 1234 (7th Cir. 1986); *Schenk v. Commissioner*, T.C. Memo. 1980-531.

Lastly, adaptability has also been considered in determining whether a structure is a single-purpose agricultural or horticultural structure. Such a structure may qualify as sec. 38 property under sec. 48(a)(1)(D) if it is specifically designed, constructed, and used for specified purposes. See sec. 48(p). Under sec. 1.48-10(d), Income Tax Regs., a structure is "specifically designed and constructed if it is not economic to design and construct the structure for the intended qualifying purpose and then use the structure for a different purpose." This Court has construed this regulation to prescribe an inquiry into a structure's adaptability in determining its qualification under sec. 48(a)(1)(D). See *McKenzie v. Commissioner*, 85 T.C. 875, 897-898 (1985).

[24]See, e.g., *Yellow Freight System, Inc. v. United States, supra; Thirup v. Commissioner*, 508 F.2d 915 (9th Cir. 1974), revg. 59 T.C 122 (1972); *Consolidated Freightways, Inc. v. United States*, 223 Ct. Cl. 443, 620 F.2d 862 (1980); *Brown-Forman Distillers Corp. v. United States*, 205 Ct. Cl. 402, 499 F.2d 1263 (1974); *Consolidated Freightways v. Commissioner*, 74 T.C. 768 (1980), affd. in part and revd. in part 708 F.2d 1385 (9th Cir. 1983). But see *A.C. Monk & Co. v. United States*, 686 F.2d 1058 (4th Cir. 1982).

ness who opined that the Addition is "economically adaptable" to various uses, including a dry warehouse, a trucking terminal, or an indoor racquetball or tennis facility. However, such witness offered no support for this conclusion, and we discern none in the record.[25] Thus, based upon the record before us, we do not think that the refrigerated area of the Addition is economically adaptable to uses other than refrigerated storage.

Having concluded that the refrigerated area of the Addition is not a "building,"[26] we turn now to the issue of whether the refrigerated area is, as petitioner contends, "tangible personal property" under section 48(a)(1)(A), and is thus eligible for the investment tax credit in an amount greater than allowed by respondent. As indicated in our findings of fact, respondent has allowed the credit for certain refrigeration system components of the Addition, including refrigeration pipes and pipe insulation, valves, and motors, having a cost of $103,470.12. Thus, the remaining costs for which petitioner is seeking the investment tax credit relate, in essence, to the structural elements of the refrigerated area of the Addition, including its foundation footings, walls, floor, roofing and supports, vapor barrier, insulation, and electrical components allocable thereto, having a cost of $404,585.[27] Petitioner bears the burden of proving its entitlement to the claimed credit. See *Uecker v.*

[25]We think that the uses suggested by respondent's expert are indeed theoretically possible but, in view of the fact that the Addition involves numerous special construction features and was constructed at substantial cost to provide a specialized structure in which low temperatures could be maintained, such alternative applications do not represent economically reasonable uses of the facility. Cf. *Stuppy, Inc. v. United States, supra* at 1384, where, in the context of the "skin covering" exception of sec. 1.48-1(e)(1)(ii), Income Tax Regs., described above, the Court found that the greenhouses there in issue "could *theoretically* be used for a multitude of alternative uses, but *economically* and *practically* speaking," could not be so used.

Cf. also Rev. Rul. 84-60, 1984-1 C.B. 13, wherein respondent indicates that, in determining the adaptability of a storage facility, not only the cost of conversion, but also, the *feasibility* of alternative use must be considered. Cf. also *Catron v. Commissioner, supra* at 315, and *Central Citrus Co. v. Commissioner, supra* at 371-372, in which we held that the cold temperatures in the facilities there in issue limited their reasonable adaptability.

[26]Since we have held that the refrigerated portion of the Addition is not a "building" under applicable case law, we need not and do not consider whether it satisfies the exception to the definition of that term contained in sec. 1.48-1(e)(1)(i), Income Tax Regs., as a "structure which is essentially an item of machinery or equipment." Compare, e.g., *Yellow Freight System, Inc. v. United States, supra* at 796-797; *Consolidated Freightways, Inc. v. United States*, 223 Ct. Cl. at 463, 620 F.2d at 873-874; *Endres Floral Co. v. United States, supra* at 24; *McKenzie v. Commissioner, supra* at 896; *Consolidated Freightways v. Commissioner*, 74 T.C. at 796-797.

[27]See note 6 *supra.*

*Commissioner*, 81 T.C. 983, 998 (1983), affd. per curiam on another issue 766 F.2d 909 (5th Cir. 1985); *Evans v. Commissioner*, 48 T.C. 704, 709 (1967), affd. per curiam 413 F.2d 1047 (9th Cir. 1969); Rule 142(a), Tax Court Rules of Practice and Procedure.

Section 48(a)(1)(A), unlike section 48(a)(1)(B), generally excludes from its scope not only buildings, but also other inherently permanent structures and their structural components. Compare sec. 1.48-1(c), Income Tax Regs., with sec. 1.48-1(d)(1), Income Tax Regs. See *McKenzie v. Commissioner*, 85 T.C. 875, 896 (1985). The record does not indicate that the refrigerated area of the Addition is anything but an inherently permanent structure, and petitioner does not argue otherwise. See generally *Whiteco Industries, Inc. v. Commissioner*, 65 T.C. 664, 672-673 (1975). See also *McKenzie v. Commissioner*, *supra* at 895-897.[28] Accordingly, other than as allowed by respondent, the costs relating to the refrigerated area of the Addition would appear to be ineligible for the investment tax credit by reason of the general rule of section 1.48-1(c), Income Tac Regs., which provides that inherently permanent structures will not qualify as tangible personal property for purposes of section 48(a)(1)(A). However, petitioner relies upon section 1.48-1(c), Income Tax Regs., the penultimate sentence of which provides that, "all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building." Petitioner argues that, under this provision, property which is in the nature of machinery may qualify as

---

[28]In *Whiteco Industries, Inc. v. Commissioner*, 65 T.C. 664, 672-673 (1975), we set forth the following six basic inquiries considered relevant in determining whether a structure is an inherently permanent structure:

(1) Is the property capable of being moved and has it in fact been moved?

(2) Is the property designed or constructed to remain permanently in place?

(3) Are there circumstances which tend to show the expected or intended length of affixation, i.e., are there circumstances which show that the property may or will have to be moved?

(4) How substantial a job is removal of the property and how time consuming is it?

(5) How much damage will the property sustain upon its removal?

(6) What is the manner of affixation of the property to the land?

The Addition is affixed to the land by means of a concrete foundation, placed at a depth of 2 to 3 feet. It is designed to remain indefinitely in its present site. The insulation and vapor barrier as well as the underfloor ventilation system cannot be removed without causing damage to the structure. We think that the structure of the refrigerated area of the Addition must be considered inherently permanent under the factors listed above.

tangible personal property even if it is inherently permanent. Petitioner asserts that the structural elements of the refrigerated area of the Addition operate together with the refrigeration system to make the refrigerated area function like a giant refrigerator or freezer and contends that the refrigerated area is thus property in the nature of machinery. Petitioner therefore concludes that all the components of the refrigerated area, including the structural elements, are eligible for the investment tax credit as tangible personal property. Respondent acknowledges that, under section 1.48-1(c), Income Tax Regs., property which is in the nature of machinery may qualify as tangible personal property even if it is inherently permanent.[29] However, respondent disagrees with petitioner's characterization of the refrigerated area as property in the nature of machinery and, accordingly, disputes the applicability of the cited provision of section 1.48-1(c), Income Tax Regs.

We think that petitioner's position evidences considerable ingenuity. Nevertheless, after serious reflection, we are persuaded for the reasons which follow that it must be rejected.[30]

Petitioner's reliance upon section 1.48-1(c), Income Tax Regs., is based largely upon *Weirick v. Commissioner*, 62 T.C. 446 (1974), a previous decision of this Court to construe that portion of the cited regulation relating to

[29]In *Roberts v. Commissioner*, 60 T.C. 861 (1973), respondent had taken the position that sec. 1.48-1(c), Income Tax Regs., excludes from the definition of tangible personal property all structures which are "inherently permanent," even if they are "in the nature of machinery." However, in *Weirick v. Commissioner*, 62 T.C. 446 (1974), respondent subsequently abandoned this position and conceded that property in the nature of machinery may qualify as tangible personal property even if it is inherently permanent. See *Weirick v. Commissioner, supra* at 452-453. Respondent's position in the instant case is consistent with that taken by him in *Weirick v. Commissioner, supra.*

[30]On brief, petitioner appears to also suggest that the refrigerated area of the Addition must be considered to be tangible personal property, because it is, in petitioner's view, similar in function to an ordinary kitchen refrigerator which itself would be considered tangible personal property under sec. 48(a)(1)(A). A similar argument was previously raised, but not considered, in *Merchants Refrigerating Co. of California v. United States*, 659 F.2d 116 (9th Cir. 1981). Therein, the Court of Appeals for the Ninth Circuit affirmed the District Court's holding that a certain refrigerated facility was not other tangible property described in sec. 48(a)(1)(B)(iii) because it was not used in the bulk storage of fungible commodities, and refused to consider the argument, raised for the first time on appeal, that the facility was, in essence, a "giant refrigerator" qualifying as sec. 38 property under sec. 48(a)(1)(A). See *Merchants Refrigerating Co. of California v. United States, supra* at 117. We reject such an argument, insofar as it pertains to the refrigerated area of the Addition because it ignores the fact that the refrigerated area is, unlike an ordinary kitchen refrigerator, an inherently permanent structure, and, as such, is generally excluded from the definition of tangible personal property under sec. 48(a)(1)(A). See sec. 1.48-1(c), Income Tax Regs.

property "in the nature of machinery."[31] Petitioner contends that, under the rationale of *Weirick*, the refrigerated area of the Addition must be considered to be property in the nature of machinery within the meaning of section 1.48-1(c), Income Tax Regs. However, we do not consider our decision in *Weirick* to require a holding for petitioner herein.

In *Weirick*, the issue before the Court was whether certain cable support and holddown towers ("line towers") and certain ramps used in the operation of a ski lift were section 38 property. The line towers were placed at various points along the course of the ski lift and served to either support or hold down the lift cable. The ramps were placed at each end of the lift and were either easily moveable wooden platforms or earthen platforms of dirt which had been bulldozed or hauled into place.

We found that the line towers were so affixed to the ground as to be considered "inherently permanent structures." We noted, however, that attached to the towers were sheave assemblies, consisting of four to eight rubber-tired pulleys upon which the lift cable would travel. The line towers had no function other than to support these sheave assemblies, which themselves were concededly property in the nature of machinery. The towers and the sheave assemblies were physically connected, and when replacement was necessary, it was often as economical to replace the tower and its related sheave assembly as to simply replace the sheave assembly on an existing tower. Upon these facts, we determined that the line towers and the sheave assemblies were so closely related that they could

---

[31] We emphasize that at issue herein is the applicability of that provision of sec. 1.48-1(c), Income Tax Regs., which defines the term "tangible personal property" to include "property which is in the nature of machinery." This regulation is to be distinguished from sec. 1.48-1(e)(1)(i), Income Tax Regs., which excludes from the definition of the term "building," property which is "essentially an item of machinery or equipment." See note 25 *supra*. The language of sec. 1.48-1(e)(1)(i), Income Tax Regs., is broader than that of sec. 1.48-1(c), Income Tax Regs., since it encompasses not only "machinery," but "equipment" as well. Therefore, the fact that property would be considered an "item of machinery or equipment" within sec. 1.48-1(e)(1)(i), Income Tax Regs., does not mean that it must also be considered to be "property which is in the nature of machinery" within sec. 1.48-1(c), Income Tax Regs. Thus, although respondent ruled in Rev. Rul. 71-489, 1971-2 C.B. 64, that certain refrigerated structures were "essentially items of machinery or equipment" so as to be excluded from the definition of building within the provisions of sec. 1.48-1(e)(1)(i), Income Tax Regs., that ruling does not compel the conclusion that the refrigerated area of the Addition is "property in the nature of machinery" within sec. 1.48-1(c), Income Tax Regs.

not properly be considered two separate groups of assets, but rather, formed an inseparable, integral mechanism which was property in the nature of machinery within the meaning of section 1.48-1(c), Income Tax Regs. Accordingly, we held that costs relating to the line towers were eligible for the investment tax credit.

With regard to the ramps at issue in *Weirick*, we found that the wooden ramps qualified as tangible personal property because they were easily moveable, but that the earthen ramps were improvements to land and as such, were excluded from the definition of tangible personal property under section 1.48-1(c), Income Tax Regs.

It is significant to note that, in *Weirick*, our inquiry was focused upon the specific items of property in issue, i.e., the ramps and the line towers. We specifically declined to adopt the view that the entire ski lift constituted property in the nature of machinery and to therefore hold that all related components were, as such, tangible personal property under section 1.48-1(c), Income Tax Regs. *Weirick v. Commissioner, supra* at 455. Thus, we refused to hold that the wooden and earthen ramps were property in the nature of machinery merely because they were used in connection with the lift. Similarly, we did not hold the line towers to be property in the nature of machinery merely because they were part of the ski lift. Rather, our holding with respect to such towers was based upon their close relationship to the sheave assemblies which, themselves, were property in the nature of machinery.

We believe that in applying the rationale of *Weirick v. Commissioner, supra*, to the facts of the instant case, our inquiry must focus, not upon the refrigerated area of the Addition as a whole, but rather, upon the structural elements thereof for which petitioner is seeking an investment tax credit. After considering the record, we do not think that the structural elements of the refrigerated area of the Addition can be said to be property in the nature of machinery. First, the structural elements are fixed in place, and do not themselves serve a "machinery" type function. Moreover, unlike the line towers at issue in *Weirick*, the structural elements are not so closely related to other property as to be considered property in the nature of

machinery. To be sure, the structural elements work in conjunction with the refrigeration system components, which are concededly "property in the nature of machinery," to provide an enclosed, refrigerated space. Nevertheless, unlike the line towers and sheave assemblies in *Weirick*, we do not find the structural elements to be so closely associated with the refrigeration system as to comprise an integral, single asset. There is, for example, no showing herein, as there was with regard to the line towers and sheave assemblies in *Weirick*, that, when necessary, it would be as economical to replace both the structural elements and the refrigeration system components as it would be to simply replace the refrigeration system components themselves. Indeed, it appears from the record that the refrigeration system components may be replaced without replacing the structural elements. Moreover, in contrast with the line towers in *Weirick*, the purpose of the structural elements herein is not simply to support and assist the functioning of other property which is in the nature of machinery. Here, the refrigeration system can operate independently of the structural elements, and the structural elements themselves serve a function independent of the refrigeration system—that of keeping out humidity and reducing temperature migration, and providing an enclosed, protected space in which frozen foods may be stored. Thus, we do not think that the structural elements can be said to be so closely related to the refrigeration system as to be considered therewith a single asset which is in the nature of machinery under the rationale of *Weirick v. Commissioner, supra*.[32]

Moreover, even if we were to go beyond the approach taken in *Weirick v. Commissioner, supra*, by considering the refrigerated area of the Addition as a whole, our conclusion would be the same. The refrigerated area is a fixed, stationary structure. Its primary function is to store frozen

---

[32]On brief, petitioner also relies upon *Marineland of the Pacific, Inc. v. Commissioner*, T.C. Memo 1975-288. In that case, we found steel towers which were part of a gondola ride used by an amusement park to be analogous to the line towers at issue in *Weirick v. Commissioner, supra*. Following our decision in *Weirick*, we thus held such towers to be property in the nature of machinery under sec. 1.48-1(c), Income Tax Regs. Since our decision in *Marineland* was based upon our holding in *Weirick v. Commissioner, supra*, and we have found that *Weirick* does not require a holding for petitioner in the instant case, we similarly do not view *Marineland of the Pacific, Inc. v. Commissioner, supra*, to require a holding for petitioner.

foods at low temperatures. Although it contains, and functions with the aid of, refrigeration system components which are in the nature of machinery, we do not think that the structure's primary function may be thought of as mechanical or accomplished by "machinery" in the ordinary sense of that term.[33] Thus, we do not think that, considered as a whole, the refrigerated area of the Addition may fairly be characterized as property in the nature of machinery within the meaning of section 1.48-1(c), Income Tax Regs.

Our conclusion that the refrigerated area is not "tangible personal property" under section 1.48-1(c), Income Tax Regs., and section 48(a)(1)(A) finds support in, and is consistent with, the statutory structure of sections 48(a)(1)(A) and 48(a)(1)(B) and the distinction created therein between "tangible personal property" and "other tangible property." Under section 48(a)(1)(A), "tangible personal property" will be eligible for the investment tax credit, irrespective of whether it is used as an integral part of, or in connection with, a qualifying activity described in section 48(a)(1)(B)(i). See sec. 48(a)(1)(A); sec. 1.48-1(c), Income Tax Regs. Under section 48(a)(1)(B), however, "other tangible property" will qualify for the credit only if it is used as an integral part of, or in connection with, a qualifying activity. See sec. 48(a)(1)(B); sec. 1.48-1(d)(1), Income Tax Regs. It is thus clear that, by requiring that "other tangible property" be used as an integral part of, or in connection with, a qualifying activity under section 48(a)(1)(B), Congress intended to impose additional conditions where the credit is claimed for such property. We think that a large, inherently permanent structure such as the refrigerated area of the Addition, which has a concrete foundation, tilt-up concrete walls and a roof, and which comprises approximately 34,650 square feet, is more appropriately categorized, not as "tangible personal property" but rather, as "other tangible property" and, as such, must meet the requirements of section 48(a)(1)(B) in order to be eligible for the investment

---

[33]Cf. *Yellow Freight System, Inc. v. United States, supra* at 796-797; *Consolidated Freightways, Inc. v. United States,* 223 Ct. Cl. at 463, 620 F.2d at 873-874 (1980); *Endres Floral Co. v. United States, supra* at 24; *McKenzie v. Commissioner, supra* at 896; *Consolidated Freightways v. Commissioner,* 74 T.C. at 796-797.

tax credit.[34] Petitioner has conceded that the requirements of section 48(a)(1)(B) have not been satisfied, because the refrigerated area of the Addition is not used as an integral part of, or in connection with, a qualifying activity. Nevertheless, petitioner asks us to, in effect, ignore these requirements by classifying the refrigerated area of the Addition as "tangible personal property." We believe that to do so would not only give an impermissibly broad meaning to the term "tangible personal property" but would also frustrate the statutory design of Congress, which requires that "other tangible property" be used as an integral part of or in connection with a qualifying activity in order to be eligible for the investment tax credit. We are, therefore, unwilling to construe the language of section 1.48-1(c), Income Tax Regs., pertaining to "property which is in the nature of machinery" so broadly as to bring the refrigerated area of the Addition within the category of "tangible personal property" under section 48(a)(1)(A).[35]

---

[34]Comparable refrigerated facilities have been held to qualify for the investment tax credit, if at all, only as "other tangible property" under sec. 48(a)(1)(B), rather than as "tangible personal property" under sec. 48(a)(1)(A). See, e.g., *Merchants Refrigerating Co. of Calif. v. Commissioner*, 60 T.C. 856 (1973). Cf. *Merchants Refrigerating Co. of Calif. v. United States*, 659 F.2d 116 (9th Cir. 1981); *Giannini Packing Corp. v. Commissioner*, 83 T.C. 526 (1984); *Central Citrus Co. v. Commissioner*, 58 T.C. 365 (1972); *Catron v. Commissioner*, 50 T.C. 306 (1968).

We think that the drafting of secs. 48(a)(1)(A) and 48(a)(1)(B) indicates that the classifications of property set forth therein are mutually exclusive. Sec. 48(a)(1)(A) refers to "tangible personal property," and sec. 48(a)(1)(B) refers in turn to "*other* tangible property." (Emphasis supplied.) The use of the word "other" in sec. 48(a)(1)(B) indicates that the term "other tangible property" as used therein must be construed to mean tangible property which is something *other than* tangible personal property or, in other words, tangible property which is not tangible personal property described in sec. 48(a)(1)(A). Thus, a determination that particular property is "other tangible property" under sec. 48(a)(1)(B) would appear to also involve as a corollary the determination that such property is not "tangible personal property" under sec. 48(a)(1)(A). Thus, the fact that comparable facilities were held to be "other tangible property" under sec. 48(a)(1)(B) supports not only the inference that the refrigerated area *is* other tangible property as such term is used in sec. 48(a)(1)(B), but also the inference that it *is not* tangible personal property as such term is used in sec. 48(a)(1)(A).

[35]In closing our consideration of this issue, we note that the language of sec. 1.48-1(c), Income Tax Regs., relied upon by petitioner, provides in relevant part, that "all property which is in the nature of machinery (*other than structural components of a building or other inherently permanent structure*) shall be considered tangible personal property even though located outside a building." (Emphasis supplied.) The parenthetical language of this sentence may be interpreted to preclude both structural components of a building and structural components of an inherently permanent structure from being classified thereunder as tangible personal property. See *Weirich v. Commissioner*, *supra* at 452 n. 7. Given our disposition of this issue, we need not and do not consider the issue, not raised by the parties, of whether the structural elements of the refrigerated area are structural components of an inherently permanent structure within such parenthetical language and are, as such, excluded from the operation of this provision of sec. 1.48-1(c), Income Tax Regs.

For the foregoing reasons, we reject petitioner's contention that the refrigerated area of the Addition is tangible personal property under section 48(a)(1)(A) and section 1.48-1(c), Income Tax Regs. Accordingly, we hold that petitioner is not entitled to an investment tax credit with respect to the Addition to an extent greater than allowed by respondent.

## Issue 2. Depreciation

The second and final issue is whether petitioner is entitled to depreciate the Addition using the 200-percent declining balance method under section 167(b)(2) and an 8-year useful life. Resolution of this issue is dependent upon our holding with respect to the investment tax credit issue, and the parties so recognize. See generally *Samis v. Commissioner*, *supra* at 621.

Section 167(b)(2) generally permits property used in a trade or business or held for the production of income to be depreciated under the declining balance method, with the allowable depreciation not to exceed 200 percent of the amount that would have been allowed if the straight line method had been used. However, under section 167(j)(1)(B), the depreciation allowance under the declining balance method is generally limited to 150 percent of the allowable straight line amount if the property in question is section 1250 property. Thus, petitioner may not use the 200-percent declining balance method of depreciation if the Addition is section 1250 property.

Section 1250 property is defined in section 1250(c) as any depreciable real property other than section 1245 property. Section 1245 property is, in turn, defined in section 1245(a)(3) using terms similar to those used in section 48(a)(1) to define section 38 property. Section 1245(a)(3) provides, in relevant part, that section 1245 property is depreciable property which is either—

(A) personal property, [or]
(B) other property (not including a building or its structural components) * * * which * * *
    (i) was used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

(ii) constituted a research facility used in connection with any of the activities referred to in clause (i), or

(iii) constituted a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities * * *

Petitioner contends that the Addition is "personal property" under section 1245(a)(3)(A).[36] Insofar as pertinent herein, the term "personal property" as used in section 1245(a)(3)(A) is defined in section 1.1245-3(b)(1), Income Tax Regs., to mean "tangible personal property" as defined in section 1.48-1(c), Income Tax Regs. As we have held in resolving the investment tax credit issue, neither the truck loading platform, nor the rail loading platform, nor the refrigerated area of the Addition qualifies as tangible personal property under section 1.48-1(c), Income Tax Regs. Since the Addition is not tangible personal property under section 1.48-1(c), Income Tax Regs., and section 48(a)(1)(A), it is also not personal property under section 1.1245-3(b)(1), Income Tax Regs., and section 1245(a)(3)(A). It is, therefore, not section 1245 property, but rather, section 1250 property under section 1250(c). Thus, the provisions of section 167(j)(1)(B) are applicable and, thereunder, allowable depreciation of the Addition under the declining balance method is limited to 150 percent of the amount allowable under the straight line method of depreciation. Accordingly, petitioner may not depreciate the Addition using the 200-percent declining balance method of section 167(b)(2).

The 8-year useful life used by petitioner to depreciate the Addition was determined under the Class Life Asset Depreciation Range System, which prescribes certain useful life ranges for various classes of depreciable property. See sec. 167(m), sec. 1.167(a)-11; Income Tax Regs. See also Rev. Proc. 72-10, 1972-1 C.B. 721.[37] Under this system, an 8-year useful life may be used in depreciating certain specified

---

[36]Petitioner does not contend that the Addition is described in sec. 1245(a)(3)(B), the relevant language of which is nearly identical to that used in sec. 48(a)(1)(B). Under both sections, "other tangible property" must be used or have been used either as an integral part of, or in connection with, a qualifying activity. As noted in our discussion of the investment tax credit issue, petitioner has conceded that the Addition is used neither as an integral part of nor in connection with a qualifying activity. See notes 7 & 8 and accompanying text *supra*. We consider this concession in the context of sec. 48(a)(1)(B) tantamount to a similar concession in the context of sec. 1245(a)(3)(B).

[37]Rev. Proc. 72-10, 1972-1 C.B. 721, which was applicable during the year in which the Addition was placed in service, was superseded by Rev. Proc. 77-10, 1977-1 C.B. 548, for

property. However, that period may not be used by petitioner unless the Addition is tangible personal property, and petitioner acknowledges as much. Since we have held that the Addition is not tangible personal property, we also hold that petitioner may not depreciate the Addition using an 8-year useful life.[38]

To reflect concessions and the foregoing,

*Decision will be entered under Rule 155.*

property placed in service in taxable years ending on or after Mar. 21, 1977. See Rev. Proc. 77-10, sec. 1.02 and sec. 4.

[38]In closing our opinion, we commend counsel for both parties for their excellent presentation of this case at trial and for their insightful and thoughtful briefs.