VAIL ASSOCIATES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 17900-85.        Filed May 26, 1987.

*William S. Huff* and *Bruce N. Lemons*, for the petitioner.
*Michael J. Cooper*, for the respondent.

FAY, *Judge*: Respondent determined a $120,196 deficiency in and petitioner claimed a $84,379 overpayment of petitioner's Federal income tax for the taxable year ended April 30, 1981. After concessions, the issue is whether certain pipelines and a pumphouse used in petitioner's snow-making systems qualify for the investment tax credit under section 48.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. In addition to the stipulations, trial testimony, and exhibits offered at trial, the Court, in the presence of counsel and expert witnesses, viewed petitioner's snow-making systems.

Petitioner is a Colorado corporation having its principal place of business in Vail, Colorado, at the time it filed the petition herein.

Petitioner has owned and operated a ski resort in Vail, Colorado, since December of 1962. Vail, which is 40 miles

---

[1]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

west of the Continental Divide at Loveland Pass, sits at the base of Vail Mountain, one of the two ski areas operated by petitioner. The other ski area, Beaver Creek, is 10 miles west of Vail Mountain. The two ski areas occupy a total of 2,450 acres of terrain. Petitioner leases most of this terrain from the U.S. Forest Service.

Although petitioner engages in some real estate activities and operates Vail Mountain and Beaver Creek during the summer months for recreational activities other than skiing, e.g., hiking, camping, climbing, etc., its primary business activity is the operation of its skiing facilities. In 1966, petitioner began making snow (1) to enhance the skiing experience of its patrons and reduce insurance costs by safely covering obstacles, and (2) to lengthen its ski season. Petitioner increased its snow-making activities from 1966 to the late 1970s and during its taxable year ended April 30, 1982, placed in service a new and improved snow-making system at both Vail Mountain and Beaver Creek. Since the new systems have been in service, petitioner has been able to lengthen its skiing season by as many as 40 days. Each day petitioner's skiing season is lengthened, petitioner generates approximately $230,000 in ski lift ticket sales revenue. With the new snow-making systems, petitioner has also been able to accurately plan its opening and closing dates, thus allowing its patrons to confidently plan trips months in advance. Some of the components of these new snow-making systems are at issue herein.[2]

The new snow-making systems mix pressurized cold dry air and pressurized cold water. The mixture is then sprayed into the atmosphere several feet above the skiing surface, forming a mist. As the mist falls to the surface, it cools and forms snow, if the proper meteorological conditions are present. Respondent's expert's report stated, "It is true that in a very broad sense, snow is 'manufactured.'"

The new snow-making systems are the most inexpensive means of satisfying petitioner's snow needs. Jeff White, petitioner's expert witness and the president of Group Delta, the engineering firm which designed the new systems, testified that "if little gremlins with straw baskets

---

[2] Snow is consumed in the skiing process. However, man-made snow is more durable and is thus consumed at a slower rate than natural snow.

* * * hauling snow out of the trees and dumping it on the trail" were the cheapest way to satisfy petitioner's snow needs, petitioner would hire them.

### The Vail Mountain Snow-Making System
### Water Supply

Water used by petitioner in its snow-making process is pumped from Gore Creek and Mill Creek, creeks which run through Vail, to a 6-million-gallon reservoir located at an elevation approximately 8,700 feet above sea level and 500 vertical feet above the elevation of Vail. From the reservoir, water is drained to a pumphouse located at an elevation approximately 20 feet below.

### Pumphouse

The pumphouse, which houses four water pumps, eight air compressors (the "pumps and compressors"), a small room containing a computer, and another small room containing a table, chairs, and a toilet, is approximately 40 feet by 80 feet, is 20 feet high, and sits on a concrete slab. It is a steel-beam-framed prefabricated structure bolted to the slab. It has sheet metal exterior walls and a metal roof. It is located at an isolated area on the mountain, near the reservoir.

Delta Group designed the pumphouse to specifically accommodate the snow-making equipment it was to house. The walls are insulated to prevent condensation which could damage the equipment. The pumphouse is heated to prevent the equipment from freezing during periods of nonuse. The concrete slab, varying in thickness from 9 to 18 inches, was designed to accommodate the weight of and vibration from the pumps and compressors and to encase a conduit containing the wiring connecting the pumps and compressors to the computer and electrical supply. The pumphouse was designed in such a way as to contain and muffle the noise created by the pumps and compressors. The interior dimensions of the pumphouse were selected and designed to accommodate heat dissipation from the pumps and compressors and to provide room for their maintenance.[3]

---

[3]The interior dimensions of the pumphouse are, in part, dictated by the requirements of the American Society of Mechanical Engineers Code.

Only one individual, the computer operator, works on a regular basis within the pumphouse. The computer and computer operator are stationed in a small computer room. Other individuals enter the pumphouse to perform maintenance work on the pumps and compressors or to use the facilities in the small room which contains a table, chairs, and a toilet. Vehicles may enter the pumphouse to install or remove equipment, but no vehicles are stored there.

If snow-making were to be discontinued, it would be more economically feasible to remove and sell the pumphouse. The high construction costs of the pumphouse, its location, and aesthetic considerations make it undesirable for conversion to alternative uses.

### Pumps and Compressors

The pumps force water received from the reservoir through water pipelines. Water leaves the pumps at approximately 40 to 42 degrees.[4] The compressors force air received from the atmosphere first through two cooling chambers and then through air pipelines. Air leaves the compressors at approximately 180 to 200 degrees.

### Cooling Chambers

The compression of the air causes an increase in heat. Heated air is inconsistent with the objective of snow-making. Accordingly, the air leaving the compressor must be cooled.

The heated air leaves the compressor and enters the primary cooling device, the aftercooler. The aftercooler consists of pipes surrounded by cold water through which the air passes and cools. The cooling of the air causes condensation of the air's moisture which must be removed to prevent frosting of air hoses used subsequently in the snow-making process. The cooled air and condensated moisture leave the aftercooler and enter the secondary cooling device, the stripping tower. Here the air is "freeze dried" and much of the moisture is removed. After the air has

---

[4]All degree references are to Fahrenheit degrees.

passed through these two cooling devices, its temperature has dropped approximately 135 to 145 degrees to approximately 45 to 55 degrees.

## Water and Air Pipelines

Water leaves the pumphouse and air leaves the stipping tower through pipelines formed by the welding of individual sections of pipe to one another. The air and water pipelines wind their way up the mountain approximately 2 to 3 feet apart and 4 feet below the surface. The pipelines are each approximately 60,000 feet long and rise approximately 1,700 vertical feet. Hydrants, which are vertical pipes that run from the air and water pipelines to the surface, are located at intervals of approximately 150 feet. The hydrants allow for the discharge of air and water from the pipelines at approximately 280 different locations.

The pipelines, in addition to transporting the water and air to remote locations on the mountain where the snow will actually be made, serve the important purposes of further reducing the temperature of both the air and water to approximately 34 to 35 degrees and of further drying the air.[5] Their location 2 to 3 feet from one another was specifically designed by Delta Group to facilitate cooling. The pipelines are specifically not insulated, even though the insulation would reduce corrosion of the pipelines, for to do so would inhibit the cooling of the air and water within the pipelines. If the air and water were not cooled in the pipelines, they would have to be cooled by refrigeration at a prohibitive annual cost.[6] Thus, the cooling and drying properties of the pipelines make the pipelines essential to petitioner's snow-making process.

The pipelines lay in the earth and are not cemented. Due to a variety of reasons, e.g., shifting and settling of the soil surrounding the pipelines, expansion and relocation of the chair lift system and ski trails, damage to surrounding trees

---

[5]As the air cools in the air pipeline, its moisture condenses, just as it does when cooled in the aftercooler. Several condensation drains are located on the air pipeline to remove accumulated condensation.

[6]Attempting to cool the air and water in the atmosphere after mixing would be unsuccessful, except in extremely low temperatures, because the release of heat occasioned by the cooling process would raise the temperature of the surrounding atmosphere, thereby decreasing the probability of snow production.

and vegetation, etc., portions of the pipelines have been excavated, removed, and relocated. The cost of excavating and removing sections of the pipeline, approximately $3 per foot, is less than the cost of new pipe, which can cost up to $24 per foot.[7] There is an active market among ski resorts for the purchase and sale of used pipelines.

### Snow Guns

Flexible hoses transport air and water from the air and water hydrants to snow guns. The air and water are mixed in the snow guns and shot into the atmosphere as mist. The mist falls to the surface forming snow if the proper meteorological conditions are present.

### Computer

A computer is located in a small room in the pumphouse. It monitors variables affecting the production of snow such as temperature and flow of the water and air in the pipelines, air temperature, wind direction and speed, and humidity. The computer assimilates this information and recommends a plan for optimal snow production. The computer also keeps a daily log of the variables it monitors for future planning purposes.

### Operation of the System

The system is operated by four individuals. One individual is a supervisor. One individual, the computer operator, is stationed in the small computer room located in the pumphouse. Depending on the variables monitored by the computer, the plan recommended by the computer, and petitioner's particular needs, the computer operator will turn on or off pumps and compressors, and instruct the remaining members of the operation crew, the snow gun operators, to commence or cease operation of snow guns at various locations. The computer operator is the only individual stationed in the pumphouse and communicates to the

---

[7]The diameter of the pipelines varies, decreasing from their greatest diameter at the pumphouse. The cost per foot of the pipe used to make the pipelines at their greatest diameter is approximately $24 per foot. The cost per foot of the pipe used to make the pipeline at smaller diameters is less.

supervisor and snow gun operators by way of portable radios.

## The Beaver Creek Snow-Making System

The Beaver Creek snow-making system is very similar to the Vail Mountain snow-making system, with some differences. The Beaver Creek system does not utilize a reservoir; it satisfies its water needs directly from a local creek. Rather than a single pumphouse, it has a pumphouse for air compressors and one for water pumps. The Beaver Creek air and water pipelines are each approximately 45,000 feet long and rise approximately 2,700 vertical feet, with 240 hydrants located approximately 200 feet apart, as compared to 280 hydrants located 150 feet apart on the Vail Mountain air and water pipelines. Further, approximately 14 percent of the Beaver Creek air and water pipelines are not buried due to the existing bedrock, requiring the water pipeline to be drained when the snow-making system is not in operation during winter months. Failure to drain the water pipeline would allow the water within it to freeze and expand, thereby bursting the pipeline. Other than these differences, the Beaver Creek snow-making system is essentially identical to the Vail Mountain snow-making system.

On petitioner's Federal income tax return for the taxable year ended (TYE) April 30, 1982, petitioner claimed an Investment Tax Credit (ITC) with respect to the water pumps, air compressors, air and water pipelines, hydrants, flexible air and water hoses, snow guns, and computer. In an amended return for the same taxable year, petitioner claimed an ITC with respect to the Vail Mountain pumphouse.[8] The ITC could not be utilized in petitioner's TYE April 30, 1982, and was carried back to petitioner's TYE April 30, 1981. Respondent disallowed the ITC with respect to the Vail Mountain air and water pipelines, the Beaver Creek air and water pipelines, and the Vail Mountain pumphouse.

---

[8]Although the record is not clear, it appears as though the Beaver Creek pumphouses are used for purposes other than just to house the snow-making equipment. At any rate, the issue of whether the Beaver Creek pumphouses are entitled to an ITC is not before us.

## OPINION

The issue is whether petitioner is entitled to an ITC under section 38 with respect to the Vail Mountain air and water pipelines, the Beaver Creek air and water pipelines (collectively pipelines), and the Vail Mountain pumphouse (pumphouse). Section 38 allows a credit in tax as determined under sections 46 and 48. Under section 46, there is allowed as a credit a specified percentage of the taxpayer's investment in section 38 property. Section 38 property is defined by section 48(a)(1), as is here relevant, as follows:

the term "section 38 property" means—

   (A) tangible personal property (other than an air conditioning or heating unit), or

   (B) other tangible property (not including a building and its structural components) but only if such property—

      (i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, * * *

         *     *     *     *     *     *     *

Such term includes only recovery property (within the meaning of section 168 without regard to any useful life) and any other property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more.

### Pipelines

Petitioner argues that the pipelines are entitled to the ITC under section 48(a)(1)(B)(i) because they are other tangible property used as an integral part of manufacturing snow.[9] The Income Tax Regulations (regulations) describe manufacturing as the "construction, reconstruction, or making of property * * * from new or raw material, by processing, manipulating, refining, or changing the form of an article, or by combining or assembling two or more articles." Sec. 1.48-1(d)(2), Income Tax Regs. Respondent does not argue that petitioner does not manufacture snow. From the broad definition given to manufacturing in the regulations, such an argument would not be successful. Respondent's expert's report stated, "It is true that in a very broad sense, snow is

---

[9]Respondent concedes that the pipelines are recovery property.

'manufactured.' " Since the regulations employ a broad definition of "manufacture," we hold that petitioner manufactures snow. Further, respondent does not argue that the pipelines are not an integral part of petitioner's manufacturing of snow. Again, such an argument would be unsuccessful as the pipelines serve the essential purposes of transporting and treating[10] the air and water used to manufacture the snow. See sec. 1.48-1(d)(4), Income Tax Regs. ("Thus, for example, in determining whether property is used as an integral part of manufacturing, all properties used by the taxpayer in acquiring or transporting raw materials or supplies to the point where the actual processing commences * * * would be considered as property used as an integral part of manufacturing.") We hold that the pipelines are an integral part of manufacturing snow.

Respondent argues that manufacturing snow is not integral to petitioner's business activities and that petitioner is not engaged in "manufacturing" within the meaning of section 48(a)(1)(B)(i).

Respondent's first argument must fail for two reasons. First, petitioner's snow-making activities are integral to its business of providing skiing facilities. Petitioner has identified approximately 40 days in which the snow cover, without augmentation by snow-making, would be insufficient to keep the ski areas open. At $230,000 per day in lost lift ticket sales revenue, without making snow, petitioner would lose approximately $9,200,000 ($230,000 × 40 days) in revenue annually, thus making the ski industry's slogan, "our business is going downhill," an economic reality for petitioner. Snow-making not only serves to increase the length of petitioner's ski season, it also allows petitioner to accurately predict its opening and closing dates, thus allowing its patrons to confidently plan trips months in advance. Finally, snow-making reduces petitioner's insurance costs by covering obstacles which could injure its patrons.

Respondent's first argument is also erroneous because the inquiry, whether petitioner's snow-making activity is integral to its business of providing skiing facilities, is not relevant. Section 48(a)(1)(B)(i) requires of other tangible

---

[10]The pipelines cool and dry the air and cool the water.

property with respect to manufacturing only that the other tangible property be integral to manufacturing, not that manufacturing be integral to the taxpayer's trade or business. As stated earlier, the pipelines are integral to petitioner's manufacturing of snow.

Respondent's second argument, that petitioner is not engaged in manufacturing within the meaning of section 48(a)(1)(B)(i), must also fail.[11] Respondent argues that manufacturing as used in section 48(a)(1)(B)(i) requires that the taxpayer be in the trade or business of manufacturing, that is, that the taxpayer manufacture and sell a product.

A careful reading of section 48(a)(1)(B)(i) indicates that there is no trade or business requirement with respect to "manufacturing, production, or extraction," although there may well be such a requirement with respect to "transportation, communications, electrical energy, gas, water, or sewage disposal services." This is so because the latter group is prefaced by the verb "furnishing," indicating that the taxpayer must furnish the described activities, presumably to customers, in order to have other tangible property, used as an integral part of such furnished activities, qualify for an ITC. The legislative history and regulations further illustrate this distinction.

The Senate report accompanying the legislation which enacted section 48, in describing other tangible property, states as follows:

> In addition to tangible personal property, other tangible property (not including a building and its structural components) used as an integral part of the manufacturing, production, or extraction process or as an integral part of a system of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services may qualify for the credit. Property is to be considered as being used as an integral part of a system of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services only if such property is used by one engaged in the trade or business of furnishing such services. * * * [S. Rept. 1881, 87th Cong., 2d Sess. 155 (1962), 1962-3 C.B. 707, 859.]

The second above-quoted sentence carefully spells out the requirement that, with respect to other tangible property used as an integral part of furnishing transportation,

---

[11]Cf. Rev. Rul. 85-93, 1985-2 C.B. 9.

communications, electrical energy, gas, water, or sewage disposal services, the taxpayer must be engaged "in the trade or business of furnishing such services," for such property to qualify for an ITC. No such requirement applies with respect to manufacturing, production, or extraction. The absence of such requirement with respect to manufacturing, production, or extraction, in light of the explicit imposition of such a requirement with respect to transportation, communications, electrical energy, gas, water, or sewage disposal services, clearly indicates the congressional intent to allow an ITC for other tangible property used as an integral part of manufacturing, production, or extraction, regardless of whether the taxpayer is engaged in the trade or business of manufacturing, production, or extraction.

The Senate report contains further indications of congressional intent not to require a taxpayer to be in the trade or business of manufacturing, production, or extraction to claim an ITC for other tangible property used as an integral part of manufacturing, production, or extraction.

[I] The terms "manufacturing," "production," "extraction," and the businesses of furnishing "transportation," "communications," "electrical energy," "gas," "water," or "sewage disposal" services are to be given their commonly accepted meaning. [II] Thus, for example, manufacturing or production includes the construction, reconstruction, or making of property from or with scrap, salvage, or junk material, as well as from new or raw material, (1) by processing, manipulating, refining, or changing the form of an article, or (2) by combining or assembling two or more articles, and includes the cultivation of the soil and the raising of livestock and other farm produce. [III] Section 38 property would include, for example, property used as an integral part of. the extraction, processing, refining, and fabrication of minerals or mineral products; the growing, raising, processing, and packing or packaging of foodstuffs; the operation of sawmills and the production of lumber and lumber products and other building materials; and the manufacture, treatment, and packaging of textiles, paper, leather goods, glass, etc. [IV] Examples of transportation businesses would be railroads and airlines. [V] Examples of communications businesses would include businesses furnishing telephone and telegraph services or radio or television broadcasting stations. [S. Rept. 1881, 87th Cong., 2d Sess. 155 (1962), 1962-3 C.B. 707, 859. Roman numerals added.]

Note that in the first above-quoted sentence, " 'manufacturing,' 'production,' and 'extraction' " are not prefaced by "businesses of furnishing," as are " 'transportation,' 'com-

munications,' 'electrical energy,' 'gas,' 'water,' or 'sewage disposal' services.' " Further, Congress' examples of section 38 property in the third above-quoted sentence, all of which relate to manufacturing, production, or extraction, are made without qualification with respect to the business of the taxpayer, whereas, the fourth and fifth above-quoted sentences give examples of businesses which furnish transportation, communications, electrical energy, gas, water, or sewage disposal services. No examples are given of manufacturing, production, or extraction businesses. The legislative intent is thus clear: other tangible property used as an integral part of manufacturing, production, or extraction may qualify for an ITC regardless of whether the taxpayer is in the trade or business of manufacturing, production, or extraction.

The regulations mimic the language of the Senate report paragraphs reproduced above. See sec. 1.48-1(d)(1)-(3), Income Tax Regs. Accordingly, no additional benefit would be realized by again explaining how. this language indicates that other tangible property used as an integral part of manufacturing, production, or extraction may qualify for an ITC regardless of the taxpayer's trade or business. Suffice it to say that the regulations, as the legislative history, so indicate.

Respondent argues that the statute, legislative history, and regulations do not specifically require a taxpayer to be engaged in the trade or business of manufacturing, production, or extraction because "manufacturing, production, and extraction were limited sufficiently to a taxpayer's overall line of business by the common, everyday meaning of the term." Our common, everyday understanding of such terms is not so limited. In fact, the common, everyday meaning of some of the other activities listed in section 48(a)(1)(B)(i) is limited to the taxpayer's business. For example, electrical energy is for the most part provided by local monopolies, whose trade or business is the furnishing of electrical energy.

In light of the language of the statute, the legislative history, and the regulations, we hold that other tangible property used in manufacturing, production, or extraction may qualify for an ITC regardless of whether the taxpayer

is engaged in the trade or business of manufacturing, production, or extraction. Accordingly, we reject respondent's second argument, that the pipelines are not subject to an ITC because petitioner is not engaged in the trade or business of manufacturing, because there is no requirement that a taxpayer be engaged in the trade or business of manufacturing for property used as an integral part of manufacturing to qualify for an ITC.[12] The pipelines meet all of the requirements to qualify for an ITC as other tangible property under section 48(a)(1)(B)(i). We so hold.[13]

## Pumphouse

Respondent argues that the pumphouse is a building and is therefore neither tangible personal property nor other tangible property. See sec. 1.48-1(c), Income Tax Regs.; sec. 48(a)(1)(B). Petitioner argues that the pumphouse is not a building within the meaning of section 48.

The term "building," in the investment tax credit context, has become a term of art. *Munford, Inc. v. Commissioner*, 87 T.C. 463, 478 (1986). In determining whether a structure is a building within the meaning of section 48, the "appearance" test and the "functional" test must be considered, with greater weight being given to the functional test. *Loda Poultry Co. v. Commissioner*, 88 T.C. 816, 824 (1987); *Munford, Inc. v. Commissioner, supra* at 479, and cases cited therein. The appearance test focuses on whether the structure looks like a building. *Munford, Inc. v. Commissioner, supra* at 479. The functional test focuses on "whether the structure provides working space for employ-

---

[12]Though we do not squarely address the issue, we note that respondent's second argument may suffer from an additional defect as well. In a real sense, petitioner is engaged in the trade or business of manufacturing snow. Petitioner rents out its manufactured snow. Just as petitioner allows its patrons to use the Vail Mountain and Beaver Creek mountains for a fee, it allows its patrons to use its manufactured snow for a fee. Further, snow is consumed in the skiing process. Thus, the purchaser of a lift ticket receives not only the right to ride the ski lifts and to ski down the slopes, but also to consume a portion of the snow on the mountains. Finally, providing snow is too closely related to providing skiing facilities for a meaningful distinction between the two to be recognized: snow is a skiing facility. Thus, it appears as though petitioner is engaged in the trade or business of manufacturing snow in addition to and in conjunction with its trade or business of providing recreational skiing facilities.

[13]Petitioner also argues that the pipelines are (1) tangible personal property because not inherently permanent, and (2) tangible personal property, even if inherently permanent, because in the nature of machinery. Although neither of these arguments is lacking in merit, our determination that the pipelines are other tangible property obviates our discussion of these arguments. Cf. *Munford v. Commissioner*, 87 T.C. 463, 495 n. 34 (1986).

ees which is more than merely incidental to the primary function of the structure." *Munford, Inc. v. Commissioner, supra* at 480. Under this dual test, a structure which appears to be a building, but does not function as a building, is not a building. See *Munford, Inc. v. Commissioner, supra* at 481, 485. Thus, unlike Justice Stewart's test for pornography—"I know it when I see it"[14]—in the investment tax credit context, seeing a building is not always sufficient. With the foregoing principles in mind, we now consider whether the pumphouse is a building within the meaning of section 48.

The Court has viewed the pumphouse and the record contains a picture of the pumphouse. It looks like a building. It encloses a space within its four walls and is covered by a roof. See sec. 1.48-1(e)(1), Income Tax Regs.

The primary functions of the pumphouse are to house and protect the water pumps, air compressors, and computer. It was designed specifically to accommodate this function: its walls are insulated to prevent condensation which could damage the equipment; it is heated to prevent the equipment from freezing during nonuse; its concrete slab is imbedded with a conduit which contains the wiring connecting the pumps and compressors to the computer and electrical supply and is designed to accommodate vibration from the pumps and compressors; and its size accommodates heat dissipation from the equipment during use. The human activity in the pumphouse—repair and maintenance of the pumps and compressors, and operation of the pumps, compressors, and computer—is merely supportive of and ancillary to the primary functions of the pumphouse. Accordingly, we conclude that, under the functional test, the pumphouse is not a building. To the extent that adaptability of the pumphouse to alternative uses is a relevant consideration here (see *Munford, Inc. v. Commissioner, supra* at 486-487), we hold that the pumphouse is not economically adaptable to alternative uses. We hold that the pumphouse is not a building within the meaning of section 48.

Having held that the pumphouse is not a building within the meaning of section 48 does not end our inquiry.

---

[14]*Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

However, in light of our holding, *supra*, that a taxpayer need not be engaged in a trade or business of manufacturing to be entitled to an ITC for other tangible property used as an integral part of manufacturing, our inquiry is near its end.[15] The pumphouse will qualify for an ITC under section 48 if it is used as an integral part of manufacturing snow.

"Property is used as an integral part [of manufacturing] if it is used directly in [manufacturing] and is essential to the completeness of [manufacturing]." Sec. 1.48-1(d)(4), Income Tax Regs. The pumphouse houses the pumps, compressors, and computers. Its slab contains the wiring connecting the pumps and compressors to the computer and electrical supply. It allows for the dissipation of heat from the pumps and compressors. It contains and muffles the noise made by the pumps and compressors. The pumphouse is used directly in and is essential to the manufacturing of snow by petitioner. We hold that the pumphouse meets all of the requirements to qualify for an ITC as other tangible property under section 48(a)(1)(B)(i).

To reflect the foregoing and concessions made by the parties,

*Decision will be entered under Rule 155.*

---

[15]Respondent has conceded that the pumphouse is recovery property.