LUCKY STORES, INC., AND SUBSIDIARY CORPS., PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 35251-86, 47728-86. Filed May 30, 1989.

*Cameron W. Wolfe, Jr., Robert J. Favole, Ruth L. Robinson,* and *Michael A. Beckius,* for the petitioner.

*Joyce E. Brit, Julia M. Dewey,* and *Ellen T. Friberg,* for the respondent.

OPINION

FAY, *Judge:* The Commissioner determined deficiencies in petitioner's Federal income tax in the amounts and for petitioner's fiscal years as follows:

| TYE | Deficiency |
| --- | --- |
| Jan. 28, 1979 | $23,437 |
| Feb. 3, 1980 | 1,491,814 |
| Feb. 1, 1981 | 1,377,830 |
| Jan. 31, 1982 | 1,658,456 |

After concessions, the following issues in these consolidated cases are presented for decision:

(1) Whether petitioner is entitled to an investment tax credit under section 38[1] with respect to certain property placed in service.

(2) Whether petitioner is entitled to claim an income tax credit under section 40 with respect to wages paid certain of its employees.

The parties submitted this case fully stipulated. The stipulated facts and attached exhibits are incorporated herein by reference. For convenience and because of the diversity of the issues presented, we have separated the specific findings of fact and opinion with respect to the investment tax credit issue and the wage credit issue.

Petitioner, Lucky Stores, Inc., was a California corporation with its principal place of business in Dublin, California, at the time the petitions herein were filed. Petitioner is the common parent of an affiliated group of corporations. For each of the taxable years at issue, petitioner and its subsidiary corporations (hereinafter collectively referred to as petitioner) filed consolidated Federal corporate income tax returns.

During the years at issue, petitioner was a high volume retailer operating a chain of over 428 retail food stores in 29 States. Petitioner sold, among other things, produce, dry groceries, frozen foods, meats, dairy products, tobacco products, and health and beauty aids.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

INVESTMENT TAX CREDIT ISSUES

Petitioner purchased its retail food store goods from a variety of wholesale vendors. These goods were then delivered to one of petitioner's distribution centers. Petitioner owned and operated distribution centers during the years at issue. These distribution centers were located in Westville, Indiana; Irvine, California; Vacaville, California; and Houston, Texas. Petitioner placed in service various items of property at all four of these centers during the years at issue herein and claimed investment tax credits (ITCs) with respect to those items. The items of property placed in service at the four distribution centers for which petitioner's entitlement to an ITC is at issue have been stipulated by the parties.

The items of property have been categorized by the parties into three different groups of property. The parties have stipulated that the Court will consider the parties' arguments with respect to only one item of property chosen by the parties from each group and that our determination as to whether petitioner is entitled to an ITC with respect to that item will control for all items in the group.

The three items of property selected from the three groups are as follows: (a) Paved areas surrounding buildings at petitioner's distribution centers (paving group); (b) cooler room insulated wall, ceiling, and door panels (cooler room group); and (c) railroad spur tracks (railroad spur group).

The paved areas surrounding buildings at petitioner's distribution centers permit access to these buildings for petitioner's and third parties' trucks. The cooler room insulated wall, ceiling, and door panels were used to fabricate cooler rooms for the temporary storage of perishable food products by petitioner before such products were transported from petitioner's distribution centers to petitioner's stores. The railroad spur tracks consisted of two sets of tracks which allowed railroad cars to enter and exit one of petitioner's buildings at its distribution centers. During the years at issue, some wholesale vendors supplied grocery items in quantities large enough to fill railroad cars. These wholesale vendors arranged for rail shipment of these goods to the distribution centers. The railroad spur tracks were used to receive and unload railroad cars.

## Petitioner's Trucking Activities

Grocery store goods were purchased by petitioner in larger quantities than all its stores were able to use at any given time. Those goods were typically delivered to petitioner's distribution centers in truckload quantities. Each of petitioner's retail food stores would order goods from the nearest distribution center as the need for goods arose. The items so ordered were trucked from the distribution center.

Deliveries of goods *to* the distribution centers from wholesale vendors were made on trucks belonging to the wholesale vendors, on petitioner's trucks, and on carriers hired by wholesale vendors or petitioner. Deliveries *from* petitioner's distribution centers to petitioner's retail food stores were all done on petitioner's trucks.

The trucks owned by petitioner were all driven by petitioner's employees. Many of these drivers were members of the International Brotherhood of Teamsters. For all the years at issue, petitioner's trucks, nationwide, logged millions of miles per year. For example, its trucks logged nearly 30 million miles during each of 1980 and 1981.

During the taxable years at issue, petitioner's trucking activities related entirely to its retail operations. Petitioner's trucks were only used to deliver goods to its retail stores or from wholesale vendors to its distribution centers. At all times, petitioner's trucks carried only items owned by petitioner.

The ITC issue relates to whether petitioner is entitled to an ITC under section 38 with respect to petitioner's paved areas surrounding buildings at petitioner's distribution centers, its cooler room insulated wall, ceiling, and door panels; and its railroad spur tracks, all of which were located at petitioner's distribution centers. Section 38 allows a credit in tax as determined under sections 46 and 48. Under section 46, a specified percentage of the taxpayer's investment in section 38 property is allowed as a credit. Section 38 property is defined by section 48(a)(1), as is here relevant, as follows:

the term "section 38 property" means—
   (A) tangible personal property (other than an air conditioning or heating unit), or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, * * *

* * * * * * *

Such term includes only recovery property (within the meaning of section 168 without regard to any useful life) and any other property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more.

Petitioner argues that the property in dispute is entitled to the ITC under section 48(a)(1)(B)(i) because such property is other tangible property used as an integral part of furnishing transportation. The Income Tax Regulations provide that "any other tangible property * * * used as an integral part of furnishing transportation * * * by a person engaged in the trade or business of furnishing any such service * * * may qualify as section 38 property." Sec. 1.48-1(d)(1), Income Tax Regs. Respondent argues, first, that petitioner is not in the trade or business of furnishing transportation services. Second, if we find that petitioner was engaged in such business, respondent argues that the properties in dispute were not used as an integral part of furnishing transportation services.

We first decide whether petitioner was in the trade or business of furnishing transportation for the years at issue. Petitioner acknowledges that the facts of this case are not meaningfully distinguishable from those of the recently decided case of *Hub City Foods, Inc. v. Commissioner,* 90 T.C. 297 (1988), on appeal (7th Cir., April 26, 1988), where we held that the taxpayer was *not* entitled to an ITC. *Hub City Food, Inc. v. Commissioner, supra,* involved the issue of whether Hub City Food, Inc.'s trucking activities associated with operating a wholesale grocery distribution center which sold and transported items to third-party retail outlets constituted a trade or business of furnishing transportation for purposes of section 48(a)(1)(B)(i). In that case, we held that the taxpayer's activity of transporting its own goods to retailers does not constitute a separate trade or business of furnishing transportation. The Court noted that the transportation businesses which are used as examples in

section 1.48-1(d)(3), Income Tax Regulations, (railroads, airlines, bus companies, shipping or trucking companies, and oil pipeline companies) all involve the provision of transportation services to third parties for hire. Without providing transportation services to third parties for hire, the Court held that Hub City Foods, Inc., could not be in the trade or business of furnishing transportation services.

Petitioner argues that the Court in *Hub City Foods, Inc. v. Commissioner, supra,* applied an erroneous interpretation of the trade or business requirement for furnishing transportation under section 48. Petitioner contends that one can be in the trade or business of furnishing transportation services without furnishing transportation services to *third parties for hire.* Petitioner relies on the recently decided Supreme Court case of *Commissioner v. Groetzinger,* 480 U.S. 23 (1987), which involved the issue of whether a full-time gambler could be considered to be engaged in a trade or business for purposes of the "trade or business" requirement of sections 55, 62, and 162. The Supreme Court held, under the facts of that case, that a full-time gambler was in the trade or business of gambling and formally rejected the test that to be engaged in a trade or business under sections 55, 62, and 162, one must hold oneself out to others as offering goods or services.

However, contrary to petitioner's position herein, the Supreme Court in *Commissioner v. Groetzinger, supra,* did not provide a sole test for determining whether a taxpayer is involved in a trade or business under all Code sections where a trade or business requirement appears. In fact, the Supreme Court explained why it could not adopt an all-encompassing trade or business test as follows:

the difficulty rests in the Code's wide utilization in various contexts of the term "trade or business," in the absence of an all-purpose definition by statute or regulation, and in our concern that an attempt judicially to formulate and impose a test for all situations would be counterproductive, unhelpful, and even somewhat precarious for the overall integrity of the Code. * * * [480 U.S. at 36.]

Petitioner is essentially requesting that we reconsider our holding in *Hub City Foods, Inc. v. Commissioner, supra,* and argues that it has met the trade or business requirement of section 48. We decline petitioner's request to

reconsider our holding in *Hub City Foods, Inc. v. Commissioner, supra,* and we continue to hold that transporting one's own goods to retailers does not constitute the trade or business of furnishing transportation services. One must be engaged in providing transportation services for third parties for hire rather than for one's own account to be engaged in the trade or business of furnishing transportation under section 48. *Hub City Foods, Inc. v. Commissioner, supra* at 302.

Support for the holding in *Hub City Foods, Inc. v. Commissioner, supra,* can be found in the legislative history to section 48 and in the language of section 48 itself. The Senate report accompanying the legislation which enacted section 48, in describing "other tangible property" of section 48(a)(1)(B)(i), states as follows:

> In addition to tangible personal property, other tangible property (not including a building and its structural components) used * * * as an integral part of a system of furnishing transportation * * * may qualify for the credit. Property is to be considered as being used as an integral part of a system of furnishing transportation, * * * only if such property is used by one engaged in the trade or business of furnishing such services. * * * [S. Rept. 1881, 87th Cong., 2d Sess. 155 (1962), 1962-3 C.B. 707, 859.]

From the second sentence of the above-quoted paragraph and from section 48(a)(1)(B)(i), it is clear that in order for a taxpayer to be entitled to an ITC with respect to other tangible property used as an integral part of furnishing transportation, the taxpayer must be "engaged in the trade or business of furnishing such services." See *Vail Associates v. Commissioner,* 88 T.C. 1391, 1400-1401 (1987). It is a reasonable interpretation of section 48 to conclude that to "furnish" transportation *services* as a trade or business, one must hold oneself out to others as offering such services. Here, petitioner does not offer transportation services to third parties. Furnishing transportation services to oneself is not within the contemplation of section 48(a)(1)(B)(i).

We hold that petitioner was not engaged in the trade or business of furnishing transportation services for the years at issue within the meaning of section 48. Having so found, it is not necessary to consider petitioner's argument that the property at issue was used as an integral part of

furnishing transportation. Consequently, petitioner is not entitled to an ITC with respect to any of the disputed property stipulated by the parties.

## WIN CREDIT ISSUES

On August 11, 1985, petitioner entered into a contract with C.I.C., Inc. (CIC) whereby CIC agreed to (a) identify employees previously hired by petitioner with respect to which tax credits under sections 40, 50A, and 50B (WIN credit) could have been claimed in prior taxable years for wages paid to such individuals, and (b) obtain certifications from appropriate State agencies with respect to such employees that the prerequisites for claiming the WIN credits were established. In accordance with this contract, CIC formally requested certification for petitioner's employees from the State of California on September 25, 1985. On December 18, 1985, CIC submitted a list to the State of California identifying petitioner's employees in California. That list was matched against the State's records to determine which employees had, for 90 days prior to hire, been eligible for financial assistance under Part A of title IV of the Social Security Act (welfare assistance).

The State of California, Department of Social Services, identified each individual for whom petitioner ultimately claimed a WIN credit as an individual who was eligible for welfare assistance (hereinafter referred to collectively as WIN employees). Each WIN employee was employed by petitioner for a period in excess of 30 consecutive days. No employee of petitioner was displaced by any WIN employee, and no WIN employee was a migrant worker as defined in section 50B(h)(2).

The average number of hours worked per week by nonsupervisory hourly employees in the United States in retail food stores in the years at issue was as follows:

| Calendar year | Hours per week |
|---|---|
| 1978 | 32.0 |
| 1979 | 31.7 |
| 1980 | 31.2 |
| 1981 | 31.0 |
| 1982 | 30.7 |

The average number of hours worked per week for *all* of petitioner's nonsupervisory hourly employees (including WIN employees) in the years at issue was as follows:

| Calendar year | Hours per week |
|---|---|
| 1979 | 32 |
| 1980 | 31 |
| 1981 | 32 |
| 1982 | 31 |

Listed below are the job categories in which petitioner's WIN employees were employed, the approximate number of WIN employees in each category, and their average hours worked per week for the years at issue:

| | No. | Hours per week |
|---|---|---|
| Retail clerks | 449 | 28.7 |
| Meat cutters | 17 | 36.2 |
| Building service | 2 | 40.0 |
| Office | 24 | 32.5 |
| Teamsters | 22 | 35.0 |

The petitions filed with the Court affirmatively asserted the WIN tax credit for its WIN employees for petitioner's fiscal years at issue. Respondent, in his answer to each petition, alleged that petitioner is not entitled to any WIN tax credits.

The issue is whether petitioner is entitled to claim a WIN credit with respect to wages paid by petitioner to its WIN employees for the years at issue pursuant to sections 40, 50A, and 50B. Section 40 allows a WIN credit as determined under sections 50A and 50B. Under section 50A(a), a specified percentage of first and second year "work incentive program expenses" are allowed as a credit. Section 50B defines "work incentive program expenses" as "the amount of wages paid or incurred by the taxpayer for services performed by eligible employees." An "eligible employee" is defined in section 50B(h)(1) as follows:

(h) ELIGIBLE EMPLOYEE.—
    (1) ELIGIBLE EMPLOYEE.—For purposes of this subpart the term "eligible employee" means an individual—
        (A) who *has been certified* by the Secretary of Labor or by the appropriate agency of State or local government as—
            (i) being eligible for financial assistance under part A of title IV of the Social Security Act and as having continually received such financial assistance during the 90-day period which immediately

precedes the date on which such individual is hired by the employer, or

(ii) having been placed in employment under a work incentive program established under section 432(b)(1) of the Social Security Act,

(B) who has been employed by the taxpayer for a period in excess of 30 consecutive days on a *substantially full-time basis* (except as provided in subsection (i)),

(C) who has not displaced any other individual from employment by the taxpayer, and

(D) who is not a migrant worker.

The term "eligible employee" includes an employee of the taxpayer whose services are not performed in connection with a trade or business of the taxpayer.

(2) MIGRANT WORKER.—For purposes of paragraph (1), the term "migrant worker" means an individual who is employed for services for which the customary period of employment by one employer is less than 30 days if the nature of such services requires that such individual travel from place to place over a short period of time.

[Emphasis added.]

Respondent makes two arguments under section 50B(h)(1) for disallowing petitioner's claimed WIN credits. Respondent argues, first, that many of the WIN employees do not satisfy the section 50B(h)(1)(B) requirement that, to be an "eligible employee," an employee must be employed on a "substantially full-time basis." [2] Respondent contends that in section 50B(h)(1)(B) "full-time" within the meaning of the statute is a national standard meaning 40 hours per week and "substantially full-time" means 30 hours per week. Petitioner argues that "full-time" and "substantially full-time" require a flexible standard that varies with particular industries.

Neither section 50B, the legislative history to such section, nor the regulations promulgated under such section define the term "substantially full-time." Respondent cites two statutes—the Food Stamp Act of 1970, Pub. L. 92-671, 84 Stat. 2048, and the Social Security Disability Amendments of 1980, Pub. L. 96-265, 94 Stat. 441—and argues, solely as a consequence of these statutes, that the statutory

---

[2]Amendments were made to the WIN tax credit provisions of secs. 44B, 50A, and 50B by the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, 95 Stat. 172. ERTA merged the WIN tax credit into the targeted jobs tax credit found in sec. 38 and 51 effective for taxable years beginning after Dec. 31, 1981. After the merger, there no longer was the requirement in sec. 51, previously found in sec. 50B(h)(1)(B), that an employee be hired on a "substantially full-time" basis for the employer to claim the tax credit at issue.

scheme was to provide that 30 hours per week was intended to be the meaning of "substantially full-time." The Food Stamp Act of 1970, *supra*, and the Social Security Disability Amendments of 1980, *supra*, provided that a person who worked at least 30 hours per week is not required to register for employment as a condition for receiving Federal assistance under both programs. We cannot conclude from the authority cited by respondent that these Acts have *any* relevance to interpreting the "substantially full-time" requirement of section 50B(h)(1)(B). It can just as easily be argued, but to no avail, that the 30 hour per week reference in these Acts represents a Congressional intent that such figure was intended to represent "full-time" employment status. Accordingly, we find no merit in respondent's argument that a definition of substantially full-time can be gleaned from the two cited Acts.

We are left with interpreting a standard established by Congress without direct statutory, or regulatory guidance with respect to the meaning of "substantially full-time." However, we do find guidance as to the meaning of "substantially full-time" in another Code section where the "substantially full-time" requirement also appears.

Former section 214 (repealed by Pub. L. 94-455, 90 Stat. 1520) allowed a deduction for certain employment related expenses for "household and dependent care services necessary for gainful employment." Under that section, both spouses had to be gainfully employed "substantially full-time" before certain expenses incurred by the taxpayers qualified for a deduction. Income Tax Regulations under section 214, adopted March 18, 1976, stated that:

an individual is considered to be gainfully employed on a substantially full-time basis if he is employed for three-quarters or more of the *normal or customary work week* (or the equivalent on the average during a month). [Sec. 1.214A-4(b)(1), Income Tax Regs.; emphasis added.]

The language of the above-quoted regulation was taken essentially verbatim from the Senate Finance Committee Report of the Revenue Act of 1971, Pub. L. 92-178, 85 Stat. 497, which described the "substantially full-time" requirement under section 214. See S. Rept. 92-437 (1971), 1972-1 C.B. 559.

Respondent contends that if we adopt a flexible standard for "substantially full-time" which varies according to the particular industry under consideration, this flexible standard would create a horrendous administrative burden as well as generate much litigation over the parameters of this term. Further, respondent argues that by adopting 30 hours per week as the standard for "substantially full-time," we would be both carrying out Congressional intent and providing administrative simplicity. We do not doubt that "substantially full-time" is not an easy test to apply in all circumstances, but we cannot usurp Congress's legislative function by defining numerically for all purposes that "substantially full-time" means 30 hours. If Congress had so intended to define "substantially full-time" as a specific number of hours for all industries, Congress would not have used the term "substantially full-time," because neither "full-time" or "substantially" are self-defining terms. Both are open to interpretation. The parties' positions in this case only confirm this. We will apply a flexible standard to the term "substantially full-time," an interpretation that we feel is in accordance with Congressional intent.

We must now give meaning to the term "substantially full-time" for purposes of the case before us. The parties have broken down by year, and have stipulated, the average number of hours worked per week in the United States by nonsupervisory hourly employees in nonagricultural establishments, in wholesale *and* retail trades, in retail trades alone, and in retail food stores. The parties have also stipulated as to the average number of hours worked per week by *all* of petitioner's nonsupervisory hourly employees in its retail food stores, by its WIN employees at issue according to each of petitioner's job categories as categorized by petitioner, and by all of petitioner's employees according to each of petitioner's job categories broken down into the national divisions of its retail food stores, all for the years at issue. We recognize that it is a difficult task to interpret first "full-time" and then to define "substantially full-time," given the fact that any of the statistics provided us could potentially be used as a reference.

We believe that a workable standard, and a reasonable interpretation of Congressional intent, would be to use the

normal and customary work week for the retail food industry as a whole as a measure of full-time. Statistics are readily available which provide the average number of hours worked each week by all nonsupervisory hourly employees in retail food stores in the United States for the years at issue. Neither party questions the reliability of these statistics which statistics have been stipulated by the parties. Using national statistics provides a workable standard for determining "full-time" and prevents manipulation of the standard by taxpayers. As for "substantially full-time," we adopt the formula utilized in repealed section 214 and define "substantially full-time" as three quarters of full-time.

Respondent's second argument is that petitioner has not satisfied the certification requirements of section 50B(h)(1)(A) for the years at issue. Respondent argues that, under section 50B(h)(1)(A), an employee must be certified as an eligible employee *contemporaneously* with employment in order for the employer to be eligible for the WIN credit. Respondent relies heavily on the legislative histories to the enactment of sections 50A and 50B and the subsequent amendments to these sections. Respondent correctly notes that Congress intended the credit under sections 50A and 50B to serve as an *incentive* for private businesses to hire welfare recipients and those individuals employed in a work incentive program. See S. Rept. 92-437 (1971), 1972-1 C.B. 559. From this, respondent argues that obtaining certifications of employees for the years at issue *after* such individuals became employed is contrary to the intent of Congress in enacting the credit because the WIN credit was not being used as an *incentive* to hire individuals eligible for welfare assistance or employed in a work incentive program. Here, petitioner was apparently unaware of the credit when it hired the WIN employees. Therefore, respondent concludes that petitioner is not entitled to the WIN credit under sections 50A and 50B where certification occurs, as here, several years after the WIN employees were hired.

While we recognize substantial merit in respondent's argument, we cannot agree with respondent's conclusion. The underlying purpose of legislation enacting sections 50A

and 50B was that the WIN credit was to act as an incentive to encourage and reward employers who sought out employees eligible for Federal welfare assistance, or those employees who are employed in a work incentive program. However, Congress did not specify *when* this certification of eligible employees was required to be obtained in order to claim the tax credit to guarantee that the credit would act as an incentive to employers rather than as a windfall.

Congress addressed this problem in Economic Recovery Tax Act of 1981, Pub. L. 97-34, 94 Stat. 172, when it merged the tax credit in section 50A and 50B into section 51 and added a new certification requirement of section 51(d)(15) [now section 51(d)(16)] which prevents retroactive certifications. The Joint Committee report, in addressing the problem of taxpayers obtaining retroactive certifications and claiming the WIN credit and the reasons for the amendments to section 51, stated as follows:

the Congress was concerned about the extent to which the credit was being claimed for employees with retroactive certifications, i.e., for employees hired before the employer knew such individuals were members of target groups. Clearly, in these cases, the credit *was not serving* as an incentive for the hiring of target group members. Accordingly, the Act requires that certification that an individual is a member of a target group must be made or requested before the individual begins work. Because of the *potential for substantial revenue losses if retroactive certifications continued,* this change was made generally effective on July 23, 1981, the date on which the Senate passed this provision. [Staff of J. Comm. on Taxation, General Expanation of the Economic Recovery Tax Act of 1981 (J. Comm. Print 1981); emphasis added.]

From the above-quoted passage, it is clear that Congress recognized that there was a potential for "substantial revenue losses" where employers were not using the credit as an *incentive* to hire certain employees. The certification requirement for eligible employees under both section 50B(h) and for "targeted groups" under section 51 are nearly identical prior to the merger of the WIN credit into section 51. Congress did not address the problem in the context of section 50B because the WIN credit available in section 50A and 50B was merged into section 51 at the same time the certification required in section 50B(d)(15) was enacted. That Congress recognized that there was a "potential for substantial revenue losses if retroactive

certifications continued" implies that prior to the effective date of the amendments to section 51(d)(15) retroactive certifications were permissible for purposes of claiming the credit under both sections 50A and 50B, and 51. Accordingly, we hold that petitioner has satisfied the certification requirement under section 50B(h)(1)(A).

To reflect the foregoing,

*Decisions will be entered under Rule 155.*